**TRIGG et al. v. SHELTON. (No. 299—3606.)** *

(Commission of Appeals of Texas, Section B. Feb. 21, 1923.)

1. Partnership  �köö83—Whether partner discharged from performance of duties was incompetent held immaterial on question of consideration for subsequent agreement to pay salary to copartner.

Whether a partner discharged by his copartner from performance of duties under the partnership contract was incompetent and his copartner had a right to remove him is immaterial on the question of consideration for a subsequent agreement between them for payment of salary to his copartner for duties and responsibility which the latter claimed did not rest on him under the original contract, but which were imposed on him by virtue of such removal.

**2. Partnership ☞83—Modification of contract as to salary held within power of partners, though unilateral as to benefits.**

A partnership contract being terminable at the will of one partner and without any condition under which his unrestrained will to do so is limited or circumscribed, a voluntary modification of the contract as to his salary, conditioned on a continuance of the contract, is within the power of the parties, though such modification is unilateral in its benefits.

**3. Partnership ☞261—Agreement to surrender of right to continue relation held a valid consideration for agreement as to payment of salary.**

A partner having the right to continue the partnership for the full term, his agreement to surrender it, dissolve the partnership, and distribute the assets prior to the time the contract required him to do so constituted a valid consideration for whatever agreement he might see fit to exact from his copartner as to the payment from firm assets of salary to which he was not entitled under their original contract, and, even if there had been no previous salary agreement, a provision in the dissolution agreement for a payment to him out of the assets would have been valid and binding on his copartners.

**4. Partnership ☞261—Partner's refusal to dissolve, as was his right under the partnership contract, not duress.**

Where a partnership contract provided that one of the members had the right to continue the relation until the contractual period expired, and that, during that period, his powers to direct the business and conduct its affairs were practically unlimited, at least so long as he did not act fraudulently, his refusal to dissolve the partnership and partition the assets was therefore nothing more than the exercise of a legal right, which could not be asserted as a foundation for duress.

**5. Contracts ☞95(3)—Threat to do what one has legal right to do not duress.**

A threat to do what one has a legal right to do is not duress.

**6. Partnership ☞261 — Contract investing partner with power to dissolve at will and partition assets not illegal when exercised in good faith.**

A partnership contract, investing one of the partners with the power to dissolve the partnership at will and partition the assets or to continue the partnership for its full term, was not for that reason inherently illegal or against public policy, and, so long as such power was exercised in good faith, the right to exercise it could not be brought in question.

**7. Partnership ☞336(3)—Evidence held insufficient to show salary stipulation in dissolution agreement inserted under duress.**

In an action by two members of a partnership against a third for an accounting, evidence *held* insufficient to show that a salary stipulation in the dissolution agreement was inserted under duress.

**8. Partnership ☞333—Right of partner to be reimbursed for maintenance expense held foreclosed under dissolution agreement.**

Where a partnership contract was silent as to maintenance of any of the contracting parties, and such an item was denied allowance by the managing partner, the right of reimbursement therefor under a dissolution agreement, expressly providing that the rights of the parties should be governed by the original agreement, was foreclosed.

Error to Court of Civil Appeals of Seventh Supreme Judicial District.

Suit by D. C. Trigg and another against J. M. Shelton. From a judgment of the Court of Civil Appeals reversing and remanding a judgment of the district court (226 S. W. 761), both parties bring error. Judgment of the Court of Civil Appeals reversed and judgment of district court reformed.

Kimbrough, Underwood & Jackson, of Amarillo, for plaintiffs.

Hendricks & Mood, of Amarillo, and Coffee & Holmes, of Miami, for defendant.

McCLENDON, P. J. This suit was brought by D. C. Trigg and S. L. Trigg against J. M. Shelton for an accounting in a cattle partnership which had theretofore existed between the Triggs and Shelton, but which had been dissolved by mutual agreement. Plaintiffs sought recovery for certain specific items alleged to be due them under the contract and dissolution agreement and for certain other items claimed by virtue of alleged mismanagement on the part of Shelton in the conduct of partnership affairs. Shelton, by way of cross-action, sought recovery against the Triggs for certain items alleged to be due him. The cause was tried to a jury upon special issues; the jury finding several items in favor of the Triggs, and some in favor of Shelton, denying all others, including all those based upon alleged derelictions in conducting the partnership business. Upon the jury's findings, the trial court entered judgment in favor of the Triggs for the sum of $11,521.70, the net balance due them under the jury findings. Shelton alone appealed, and in his appeal he questioned only two of the items found against him. One of these items was $10,312.50, which had been paid by the Triggs to Shelton as one-half of his salary at the rate of $7,500 per annum from January 1, 1914, to October 1, 1916, under a supplemental contract between the parties, which contract the jury found was executed by the Triggs under duress. The other item was $739.78, being one-half of the amount found by the jury to have been expended by the Triggs for the maintenance of S. L. Trigg during the partnership, which the Triggs claimed was a proper charge against the partnership under a supplemental verbal agreement between the

parties. The salary item was ratified in the dissolution agreement and subsequently paid by the Triggs under protest. The Triggs contended and the jury found that there was no consideration for this item, and that the salary contract, its ratification in the dissolution agreement, and its subsequent payment were under duress. Shelton contended that the evidence would not support these findings. With reference to the maintenance item Shelton contended that the dissolution agreement estopped the Triggs from asserting it. The Court of Civil Appeals reversed the trial court's judgment, and remanded the cause upon a unanimous holding that error was committed in the admission of certain testimony, but overruling Shelton's contention concerning the maintenance item. By a divided court it was held that the evidence supported the jury findings of want of consideration and duress as applied to the salary item. 226 S. W. 761–789.

Both the Triggs and Shelton applied for writ of error, and both applications were granted. The cause is docketed under the style of the application of the Triggs.

The evidence bearing upon the controlling issues in the case may be stated as follows:

On July 31, 1912, the Triggs and Shelton, who will be designated as the purchasers, entered into a contract with the Capitol Freehold Land & Investment Company, Limited, which will be referred to as the syndicate, whereby the former purchased from the latter certain cattle, estimated at approximately 22,000 head, and certain horses and mules, estimated at about 400, and whereby they leased from the syndicate for ranching purposes their ranch property in Dallam and other named counties, consisting of some 600,000 acres for a period of five years and four months, beginning January 1, 1913, and terminating May 1, 1918. The cattle, horses, and mules were purchased at certain designated prices per head, and the land was leased at 10 cents per acre per annum, payable quarterly in advance. The purchasers were to pay $50,000 cash upon the execution of the contract, $200,000 on November 1, 1912, and the balance in five equal annual installments to be evidenced by notes. The purchasers were given the right to sublet any of the lands, but were not to be relieved from the rental obligations. The syndicate was to furnish certain material for repairs upon requisition by the purchasers, and the latter were to surrender the leased property at the termination of the lease in as good condition as when delivered to them, usual wear and tear only excepted. The contract also provided for sale of the land in whole or in part, with the exception of a certain designated portion, giving the vendees the right after specified notice to terminate the lease on property so sold, in which event the rentals would be proportionately abated. The other provisions of the contract are not material to the instant controversy.

On the same day that this contract was executed, Shelton and the Triggs entered into a written agreement of partnership with reference to the property so purchased by them. This contract is set out in full in the opinion of the Court of Civil Appeals, 226 S. W. 763–765. It will only be necessary, we think, to state the substance of those portions of the contract which are relevant to the issues in controversy.

The contract provided that Shelton as first party and the Triggs as second parties were to engage as partners in the ranch and cattle business for five years from the contract's date. Shelton was given the right at any time to dissolve the partnership, sell its assets, pay its debts and distribute the proceeds; but this right to dissolve was not accorded to the Triggs. The Triggs were to contribute their work and labor under direct supervision of Shelton in handling the ranch business, taking care of the cattle and conducting the details of the business with their best skill and labor and without charge for their services. Shelton agreed to advance the $250,000 to be paid to the syndicate, and the Triggs were to execute to him their two notes for $25,000 and $100,000 respectively, the former to mature five years from date, the latter maturing 30 days from July 30, 1917, subject, however, to be matured earlier if the partnership were sooner dissolved. These notes were to be secured by chattel mortgage upon all of the interest of the Triggs in the partnership assets, and the chattel mortgage was also to secure any further advances by Shelton to the Triggs or to the partnership. Shelton was to have the sole and exclusive management of the affairs of the partnership and its property and assets over the Triggs, no property was to be sold without his consent, and his control of partnership affairs was to extend to any details in handling the partnership property, and was to be unlimited whenever he desired to execute it, even to the employment and discharge of men on the ranch; "and it is further agreed if at any time either or both of the parties of the second part shall become incapacitated by sickness or otherwise, or refuse to contribute the adequate amount of work and labor under the supervision of said party of the first part for the handling of said ranch business, or in the event of the death of either or both of said parties of the second part, said party of the first part is to have the right to employ any other man or men to take the place of said parties of the second part, at the expense and liability of said parties of the second part, or their estate, in accordance with the condition creating the necessity for such substitution." Shelton was also to have the right to wind up the partnership business upon the death of ei-

ther or both of the Triggs without interference by their personal representative. Shelton was given specific authority to reduce the holdings of the partnership, sell any of the partnership property, sublease any part of the land, etc., without concurrence of the Triggs, and to sell all of the partnership property and wind up its affairs, pay its debts and retain the amount owing him by the Triggs, and distribute the proceeds to the parties entitled to them. This right he was given to exercise at any time. Shelton's right to wind up the partnership affairs was given priority over any attempted dissolution by the Triggs. Further acquisitions of partnership property were to be owned by the parties in the same manner as provided generally in the contract. Shelton was given the right, upon sale of any of the cattle, to apply the proceeds to any obligation of the partnership or any obligations of the Triggs to him or the partnership, and in event of dissolution Shelton was to have the right to distribute the net proceeds. In the event of any disagreement between the parties with reference to handling the business, Shelton was to have the final decision. Shelton, as one party, and the Triggs as the other, were to share equally in the profits and losses of the business.

On January 5, 1914, a supplemental agreement was made between the parties, which is set out in full in the majority opinion of the Court of Civil Appeals, 226 S. W. 765. This contract recited that at the time the original contract was drawn it was not contemplated that Shelton should give any considerable portion of his time and labor to the management of the business, and that since it had been agreed that D. C. Trigg be relieved from his obligation to contribute his labor to the business, and that therefore much more time and labor would be required by Shelton than contemplated, it was thereupon agreed that Shelton should be allowed a salary, to be paid out of the partnership assets when the business was wound up, of $7,500 per annum, beginning January 1, 1914.

On January 14, 1916, a dissolution agreement was entered into between Shelton and the Triggs, which was evidenced by two written instruments of that date, each of which referred to the other. The first of these instruments set forth generally the terms of the dissolution, and the second partitioned all the lands which had been leased from the syndicate, except those previously sublet, apportioning to the Triggs about 200,000 acres and to Shelton about 165,000 acres, and provided the method for partitioning the cattle, horses, mules, and other personal property between the parties. The first of these instruments recites the original partnership agreement of July, 1912, the original purchase from the syndicate, and the supplemental or salary contract of January 5, 1914.

Subdivisions 1 and 2 of this instrument follow:

"1. Until the final consummation of this contract and division of said property under the terms of the partition contract of this date, the terms of said partnership agreement between the said parties as evidenced by said instrument of July 31, 1912, and January 1, 1914, shall remain in full force and effect and the rights of the parties governed thereby; and if for any reason these contracts for dissolution and partition shall not be finally consummated the said contracts shall remain in full force and effect unaffected by any of the stipulations herein contained.

"2. Subject to the provisions of this contract said partnership heretofore existing between said parties shall cease and determine upon the completion of the division of the partnership property on or about the first day of December, 1916, provided that it is expressly agreed and understood that if this dissolution is carried into effect the salary to be paid to the said John M. Shelton under the terms of the contract of January 1, 1914, shall cease from and after the first day of October, 1918; but it is expressly agreed and understood that he shall have the right to pay himself such salary from the first day of January, 1914, to said date out of the partnership funds or assets in his hands at the time of the final dissolution. Nothing herein contained shall affect the right of the said John M. Shelton with reference to winding up the affairs of the partnership as contained in said partnership agreement except as such provisions may be inconsistent with express provisions of this contract, or the contract with reference to the manner of partition of such property."

It will not be necessary to set out in detail the provisions of the dissolution agreements. It suffices to say that these agreements provided that the cattle should be divided in kind by beginning at a certain part of the ranch, rounding up and dividing the cattle into groups of different grades and classes, and dividing each class into two parts and drawing lots therefor. The horses and mules were to be divided in substantially the same manner. Provision was made for taking care of the lease money thereafter to accrue to the syndicate and for requisitions on the syndicate for repair supplies. These matters were to be handled through Shelton, and he was to be paid a certain amount per month by the Triggs for clerical expenses. Matters of adjustments were provided for in case any of the lands partitioned to either of the parties were sold and the lease thereon canceled; and provisions were made for indemnifying either of the parties for any derelictions of the other, and for the adjustment of obligations that might arise under the lease contract. Provision was made for inspecting the properties during the summer of 1916. Division of the personal property was to begin on October 1, 1916, and be completed by December 1, 1916. There were a number of other provisions which imposed

mutual obligations upon the parties, and there was a general provision for arbitration in case of dispute. When the division was completed an audit was provided for. The second of these dissolution instruments recited the original partnership agreement and the salary modification of January 5, 1914, and set out in detail the method of making the partition, including the following stipulation:

"The three and four year old steers at the North Camp and about one thousand (1,000) head of the oldest cows, which shall be cut out and held separately as the work proceeds, will not be divided until all the other cattle are divided, it being contemplated that they will be sold at or prior to the division of said cattle, and the funds will be for division instead of the cattle; but if said steers are not previously sold, upon completion of the partition of the other cattle they shall be rounded up and divided in the same manner as the other cattle. In the event the cows have not been sold and there is not in the hands of the partnership sufficient funds to pay off and discharge all partnership liabilities at the time, said one thousand (1,000) head of cows, or so much thereof as may be necessary, shall be sold and the proceeds shall go into the partnership fund; but if there shall be on hand at such time funds sufficient to pay off and discharge all partnership liabilities, then said one thousand (1,000) head of cows shall be divided as the other cattle."

The dissolution and division of the partnership assets were carried out in accordance with these instruments.

The evidence shows that some time in 1913 Shelton made several specific complaints concerning the manner in which D. C. Trigg was conducting the business, and finally Shelton demanded that D. C. Trigg relinquish his duties as ranch manager, and permit Shelton to employ a substitute. This was done, although the Triggs contend that there was no cause for this change, and D. C. Trigg only relinquished his position and quit the ranch on account of Shelton's insistence. Shelton placed one Exum on the ranch in D. C. Trigg's place, to which the Triggs objected on account of his being a relative of Shelton. Exum was employed at a salary of $75 per month, and this salary was paid by the partnership up to January 1, 1914, upon which date the Shelton salary contract became effective.

The Triggs contend that the salary contract was without consideration, because Shelton was not entitled to any compensation for his services under the original contract, and no duties were imposed upon him by the salary contract that the original contract did not impose. They also contend that the salary contract was executed by them under duress, their claim in this regard being that Shelton threatened to dissolve the partnership, wind up its affairs himself, sell out the partnership assets under his chattel mortgage and under his contractual right as given in the partnership contract; that they were then indebted to Shelton in the amount of the notes they had executed to him, and were not financially able to take care of their interests; that Shelton's threatened action would have spelled their financial ruin, because their property would have been sacrificed; that they had no adequate redress; that they executed the contract through fear that Shelton would sell the property at a sacrifice and render them bankrupt; that but for this fear, they would not have made the contract to pay the salary. They testified that Shelton made the threats substantially as stated, and demanded the execution of the salary contract as a condition precedent to his not carrying out those threats. In the view we take of the case it is not necessary to set out the evidence upon this issue further than generally as stated above, which is the version of the Triggs. We will not, at this time, state the facts which relate to the maintenance item.

The partnership business was continued under the management of Shelton under the original and salary contracts until the dissolution agreement of January 15, 1916. The evidence shows without contradiction that the business was very profitable. Up to January 1, 1916, the partnership returns had met all partnership obligations, including the amounts due to the syndicate; and the obligations of the Triggs to Shelton had been reduced to something under $100,000. The net assets of the partnership at this time were conceded by the Triggs to be worth more than $1,000,000; and they actually received as their share in the division property valued at approximately $600,000. They testify that from 1914 on they endeavored to have a division of the property with Shelton and a dissolution of the partnership, but that Shelton desired to continue the partnership to the end of the contractual period and refused to divide and dissolve. Early in January, 1916, they borrowed money from a Dallas bank, and paid Shelton all they owed him, giving the bank their note for the amount with a chattel mortgage on their interest in the partnership cattle. At that time the partnership owed no debts, and its only potential liabilities were the rentals to accrue under the lease contracts and current expenses. The Triggs contend that the salary agreement in the dissolution instruments was inserted under duress. While the testimony in this regard is quite voluminous, the substance of it is contained in the following extract from the evidence of D. C. Trigg:

"With reference to these two instruments [dissolution and partition agreements], I had been trying since 1914 to get Mr. Shelton to agree to a division of the property and a dissolution of the partnership. He would not di-

vide at all; he was going to run it out the full time. In endeavoring to obtain a division and dissolution I said, with reference to our indebtedness to him, that I was ready to pay him every dollar I owed him and settle up and divide the property. I don't think there was ever a time mentioned, dissatisfaction coming up, but what he referred to his authority to do these things. As to what parts of the two contracts of January, 1916, I objected to, I made objections to that salary and cutting out these cattle. I discussed my objection with Mr. Shelton, and he would not omit those provisions at all. He said he would not make a contract of dissolution without those provisions—would close out the business first. If I didn't agree to this dissolution, I believed that he would close me out and take everything I had, as far as it would go, to pay the debts, which would ruin my business. We actually paid Shelton every dollar that we owed him in January, 1916—January 5th, or somewhere along there. So far as indebtedness is concerned, we were clear of Mr. Shelton, and so far as the Capitol syndicate was concerned, we were clear of them. Every dollar had been paid. We paid Shelton and the syndicate every dollar before these dissolution contracts of January, 1916, were entered into. As to how Shelton was going to ruin us at that time he could still sell the outfit. He had it under his control; he would not give it up and wanted to do it. He refused to turn it over to me. I didn't have a half interest in the cattle. The Security National Bank had it, I had a half interest in the cattle, but they were all turned over to the Security National Bank. They had a mortgage on it, and I could not go out and sell a half. As to Shelton not having any control over the Security National Bank, he did over the cattle. I don't know how Shelton could have sacrificed and sold out our interest at that time. He had been, and was then, when we made that 1916 contract, just bearing down on us to beat the band, and we were under terrible pressure. I was afraid of him so far as our interest in the property was concerned. I first sprung the question of dissolution, and had been thinking about it for quite a little while, about when I got him paid down to this one note, and he was making it so unpleasant and so mean for us, I determined that I was going to get away from it at all hazards, and I went to Dallas and got a contract for the money at the City National Bank. If he took that course (to sell out the business and wind it up) I thought I would sustain a heavy loss. If it had not been for this apprehension I would not have given the check at all under any circumstances. At the time the partnership contract was made he said he never expected to refer to it, unless we were trying to rob him or slough off stuff, and he was putting it [his authority to sell and wind up] there to protect himself, and he never expected to refer to it. My fear of his sacrificing our property had something to do with my not mentioning the claims against the property. After the making of this contract in two parts on January 14, 1916, the business continued under the same management until the partition was completed."

No facts were testified to by either of the Triggs which in any way tend to show any oppression or duress on the part of Shelton further than as contained in this extract.

As stated above the dissolution agreement was carried out in accordance with its terms and the property partitioned. During the course of the partition the Triggs demanded a division of the steers and cows which the dissolution instruments provided should be reserved to discharge any partnership obligations. It appears that the steers were divided, but Shelton demanded that 1,000 head of cows be held to secure him in the salary item, unless the Triggs would put up a check for $10,312.50 in his favor. This demand was complied with, and the cows were divided; the Triggs, however, protested, and stated that they would get the money back. The check was collected by Shelton. The Triggs contend that this payment was made under duress.

[1, 2] We think there can be no serious question but that both the salary and dissolution agreements are supported by a valid consideration. The holding of the majority of the Court of Civil Appeals that the salary contract is without consideration seems to be rested upon the proposition that D. C. Trigg was wrongfully expelled by Shelton from the discharge of his duties under the partnership contract, and that Shelton agreed to do only what the original contract bound him to do. The evidence shows that Shelton made repeated complaints at the manner in which D. C. Trigg was performing his duties, and that on the occasion of each complaint D. C. Trigg changed his methods so as to meet Shelton's demands. Shelton, however, finally insisted on Trigg's removal on the ground that he was incompetent to do the work correctly, and D. C. Trigg was replaced by Exum, and thereafter did not perform the duties which the contract imposed on him. This, however, was under protest by the Triggs. The evidence is conflicting as to whether Shelton was right in his contention that D. C. Trigg was incompetent to do the work. There is no suggestion of any duress in connection with this particular transaction. It arose before the salary matter came up. Our view in regard to this matter is that it is immaterial whether D. C. Trigg was incompetent, and, if so, whether under the contract Shelton had the right to remove him. There seems to be no question but that a bona fide issue arose between Shelton and D. C. Trigg as to the advisability of the latter's continuing to perform his services, and that the Triggs acquiesced, although under protest, in the arrangement which Shelton made. Later on when the salary matter arose the agreement was made by which Shelton was to assume certain duties and responsibility which he contended did not rest upon him under the original contract, but which were imposed upon him by virtue of Trigg's removal. Regardless of the merits of this contention, the partnership contract

was terminable at the will of Shelton. There was no condition prescribed by the contract under which Shelton's unrestrained will to terminate was in any way limited, or circumscribed. Any voluntary modification of the contract conditioned upon its continuance by Shelton was therefore within the power of the parties, although such modification were unilateral in its benefits. We so held in a case of Insurance Co. v. Teague (Tex. Com. App.) 237 S. W. 248.

[3] Passing to the question of consideration to support the salary provision in the dissolution agreements: The Court of Civil Appeals has construed the partnership contract as being for the full term of five years unless Shelton should desire sooner to dissolve the relation. The Triggs were not at liberty to dissolve the partnership until the five year period expired, and Shelton had the right to continue the partnership for the full period if he so desired. With this construction we agree. It may be that the Triggs for cause might earlier have dissolved the partnership in a legal proceeding; but with that question we are not concerned. In the absence of cause, Shelton had the right to continue the partnership for the full term. Having that right, clearly an agreement on his part to surrender it, dissolve the partnership, and distribute the assets prior to the time the contract required him to do so, constituted a valid consideration for whatever agreements he might see fit to exact from the Triggs. Even if there had been no previous salary agreement, we think it is quite clear that a provision in the dissolution contract to pay Shelton out of the partnership assets a specified sum of money in consideration for his agreement to dissolve would have been valid and binding upon the Triggs. This of course is aside from the question of duress and viewing the transaction as entirely voluntary on the part of the contracting parties.

[4, 5] In considering the question of duress as applied to the agreements regarding salary and the payment of that item, it should be borne in mind, at the outset, that the case does not present the issue of a contract entered into or a payment made in order to obtain the possession of property wrongfully withheld from the owner. There seems to be no serious contention but that Shelton, under the partnership contract, had the right to continue the relation until the contractual period expired, and that during that period his powers to direct the policy of the business and conduct its affairs were practically unlimited, at least so long as he did not act fraudulently. His refusal to dissolve the partnership and partition the assets was therefore nothing more than the exercise of a legal right, which could not be asserted as a foundation for duress. A threat to do what one has a legal right to do is not duress. Brewing Co. v. Harlan

(Tex. Com. App.) 228 S. W. 1090; Ward v. Scarborough (Tex. Com. App.) 236 S. W. 437; 9 R. C. L. 722; 13 C. J. p. 404, § 321e, and note 2 on page 403.

The only theory upon which duress in the execution of the original salary contract or in the insertion of the salary stipulation in the dissolution agreements can be predicated is that Shelton had it within his power to so exercise his right of disposition of the partnership property as to sacrifice the Triggs' interest; that there was no legal excuse for such use of his powers; that his threats to do so created a present and imminent danger to the property rights of the Triggs, from which they had no other means of immediate relief than to comply with Shelton's demands; and that the effect of such threats upon the minds of the Triggs was such as in legal contemplation to destroy their free will in that they were put to the alternative of complying with Shelton's demands or losing their property or property rights. This we think is stating the law of the case as strongly as may be from the viewpoint of the Triggs. The threatened exercise of a right of sale under a deed of trust as constituting duress was considered in the recent case of Ward v. Scarborough, above, in the opinion in which there is an extended review of the adjudicated cases upon this subject. It should be observed that in that case the party claiming the right of sale had by his own fraud created a situation which rendered the owner of the property helpless to prevent the sale, the result of which would have been to place the record title beyond his power of protection; and in addition the threatened sale was in itself unlawful because the notes secured by the trust deed had been verbally extended. The several opinions by the Court of Civil Appeals in the instant case embody a careful review of the leading authorities upon this subject. A further review of them we think is unnecessary. The difficulty here is not so much in determining the legal principals involved as to apply them to the facts of the case.

[6] It may be conceded that the partnership invested Shelton with extraordinary powers over the property of the Triggs, but the contract was not for that reason inherently illegal or against public policy. The business involved large financial obligations, extending over a period of years, and might, even under the best management, entail heavy losses. The extraordinary powers given to Shelton, presumably for his protection, were not such as he had no right to contract for. Nor is the validity of the original contract, or any of its provisions, assailed. So long, therefore, as Shelton acted in good faith his right to exercise the powers which the contract gave him cannot be brought in question. The only restraint which in any event could be placed upon his freedom of action in this regard was that he might not be permitted

to use those powers fraudulently to the detriment of the property rights of the Triggs or as a mere pretext to extort from them an unconscionable bargain. If the evidence will not support a finding of such fraudulent use of his powers, then it will not support the verdict upon this issue.

In order to sustain the verdict, it is quite clear that there must have been duress, not only in the execution of the original salary agreement, but also in the insertion of the salary item in the dissolution contract. While we have serious doubts as to the sufficiency of the evidence to sustain a finding of duress in the execution of the original salary agreement, we are quite clear that the evidence will not support a finding of duress in the insertion of the salary provision in the dissolution agreement and we therefore express no opinion upon the question of duress as affecting the original salary contract.

[7] We have reached the conclusion that the evidence will not support a finding that the salary stipulation in the dissolution agreement was inserted under duress. The evidence clearly shows that after the salary contract was made and up to the time of the dissolution agreements, it was the Triggs, and not Shelton, who desired a dissolution of the partnership and partition of the property. Shelton, according to the testimony of the Triggs, wanted to continue the partnership for its full term, as he had a legal right to do. The partnership had proved to be very profitable to both parties under the management of Shelton. All the obligations had been met, and its net assets were worth over $1,000,000. Dissolution at that time involved, not only a partition of the assets, but various adjustments relating to the further obligations to the syndicate in connection with the rental contracts. Shelton could not partition the property, and relieve himself of further obligation to the syndicate; and a partition of the leased lands would place one-half of those lands under the actual control of the Triggs, without relieving Shelton from liability to the syndicate for any dereliction on the part of the Triggs during the remainder of the lease. In other words, Shelton would be relinquishing his control and management of the leased property, but would continue to be responsible for the obligations concerning the property which were imposed by the lease contract. The partnership contract by its terms did not expire until July 31, 1917, and the lease contracts did not expire until May 1, 1918. The evidence conclusively shows that Shelton was insisting on continuing the partnership, and the Triggs were insisting upon a dissolution and partition.

We do not regard the testimony of the Triggs which we have quoted above as evidencing any threat on the part of Shelton to sell out the property, unless the salary stipulation were embodied in the dissolution agreements. The whole course of conduct on the part of Shelton negatives such conclusion. The statement above quoted which the Triggs put into the mouth of Shelton, to the effect that he would close out the business and sell the property before he would relinquish his claim to salary, is not, we think, susceptible of the construction that this was a threat on Shelton's part to pursue such course if they did not agree to the salary provision. Such statement so made must be construed in the light of surrounding circumstances. Shelton was not demanding the dissolution of the partnership, but was opposing it. He was insisting upon a continuance of the partnership. The Triggs were demanding dissolution. The statement by Shelton under such circumstances that he would sell the property before he would relinquish his salary agreement was nothing more that a statement of what course he would pursue if no other alternative offered. We are unable to interpret the testimony as in any way sustaining a threat on Shelton's part to do any thing other than what he had a perfectly legitimate right to do. He acceded to the wishes of the Triggs to dissolve and partition upon terms mutually agreeable to all the parties. He thereby relinquished a valuable right which he had to continue the partnership. In order to obtain the dissolution and partition the Triggs ratified the salary agreement, and purged it of any invalidity which may have theretofore attached to it. It is our conclusion therefore that the dissolution agreement was not obtained under duress.

These conclusions render unnecessary an extended discussion of the alleged duress in connection with the execution of the check by the Triggs in payment of the salary item. We think it only necessary to add in this regard that the evidence will not support a finding of duress. The dissolution agreement specifically provided for the retention of the cows for the payment of partnership obligations. The Triggs put up the check in order to obtain an immediate division of the cows, a right which the dissolution agreement denied them. In refusing this division, unless he were paid his salary, Shelton was only exercising a legal contractual right. We concur in the conclusions of Judge Huff upon this subject, as expressed in his dissenting opinion.

[8] With regard to the maintenance item the version of the Triggs may be briefly stated as follows: The original contract was silent as to maintenance of any of the contracting parties, but provided specifically that the second parties should receive nothing for their services. S. L. Trigg was to act as ranch boss. His family were quartered on one portion of the property, and his duties largely demanded his presence at another portion. The Triggs testified to a verbal

agreement with Shelton that the living expenses of S. L. Trigg's family should be paid by the partnership, and these bills were so paid during the first few months of the partnership. Early in 1913, Shelton made an objection to some of the items in these bills, which amounted to $80, and the Triggs paid him one-half of this amount. Shortly thereafter Shelton refused to allow these bills to be further paid from the partnership assets, and from that time on the practice was discontinued. No further mention was made of this matter during the partnership or when the dissolution contracts were made or being carried out. D. C. Trigg testified:

"My fear of his [Shelton's] sacrificing our property had something to do with not mentioning the claims we had against the property."

The testimony is quite clear that the maintenance item was not omitted by mistake, but, on the contrary, was designedly not mentioned by the Triggs in the dissolution negotiations. We think the dissolution agreement foreclosed whatever rights the Triggs may have had theretofore to be reimbursed on this item. That agreement specifically provided that the rights of the parties should be governed by the instruments of July 31, 1912, and January 1 (5), 1914. The maintenance item was predicated upon an alleged verbal agreement acquiesced in for a while by Shelton, but subsequently repudiated by him. Whatever the rights of the Triggs may have been in this regard, they knew that Shelton did not recognize those rights. With that knowledge they executed the dissolution agreement, which specified that their rights should be governed by the original and salary contracts. This action on their part as effectually eliminated this item from further controversy as if it had been excluded by express language from the dissolution agreement.

The conclusions we have reached render immaterial the questions raised affecting the rulings of the Court of Civil Appeals upon the admissibility of testimony and remand of the entire cause.

It is our conclusion that the judgment of the Court of Civil Appeals should be reversed; that the judgment of the trial court should be reformed so as to eliminate the salary and maintenance items, leaving intact the trial court's judgment in favor of the Triggs against Shelton for the balance, which is $469.42, with interest thereon from June 18, 1919, at 6 per cent. per annum; and that as so reformed that judgment should be affirmed.

CURETON, C. J. Judgment of the Court of Civil Appeals reversed, and judgment of the district court reformed so as to only award to the Messrs. Trigg a judgment against Shelton for $469.42, with six per cent. interest from June 18, 1919; and as so reformed the judgment of the district court is affirmed.