**COLEMAN et al. v. COLEMAN et al.　(No. 7722.)**

Court of Civil Appeals of Texas. San Antonio. March 16, 1927.

Rehearing Denied April 13, 1927.

**1. Husband and wife ⚖︎273(11)—Survivor of community estate may incumber it with trust deeds.**

Survivor of community estate may borrow money and incumber estate with deeds of trust in administration thereof.

**2. Husband and wife ⚖︎276(1)—Husband's rights to administer community estate held not changed by statute, except by requirement of bond (Rev. St. 1925, art. 3667).**

Rev. St. 1925, art. 3667, made no change in husband's rights to administer community estate, except by requiring him to give bond to preserve rights of wife's heirs and keep accurate accounts.

**3. Husband and wife ⚖︎249—"Community property" is property owned in common by husband and wife (Rev. St. 1925, art. 4619).**

"Community property," under civil law and Rev. St. 1925, art. 4619, is property owned in common by husband and wife as kind of marital partnership.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Community Property.]

**4. Husband and wife ⚖︎265—Husband's unrestricted dealings with community property are conclusive; wife having only right of partition on termination of marital rights (Rev. St. 1925, art. 3661 et seq.).**

Under civil law and Rev. St. 1925, art. 3661 et seq., husband has control and power to dispose of community property, and his dealings therewith are final and conclusive, in absence of restrictions; wife having only right of partition on termination of marital rights.

**5. Husband and wife ⚖︎274(1)—Wife's rights in community property survive in her children on her death, subject to husband's management and ultimate disposition thereof.**

Wife's rights in community property survive in her children on her death, subject to husband's management, control, and ultimate disposition thereof.

**6. Husband and wife ⚖︎276(7)—Husband administering community estate cannot be required to account as other trustees; "administration pending in any court" (Rev. St. 1925, art. 3669).**

Husband, having unlimited power in administration of community estate, cannot be required to account as other trustees; his manipulation of trust not being administration pending in any court within Rev. St. 1925, art. 3669.

**7. Husband and wife ⚖︎276(7)—Judgment for minor children on father's bond as administrator of community property held proper (Rev. St. 1925, arts. 3667, 3670).**

Where husband, as survivor and administrator of community estate, used property thereof largely to pay his individual debts, and made no satisfactory report or accounting, as required by Rev. St. 1925, art. 3670, court was justified in treating as extinguished only community debt existing when he gave bond required by article 3667, and rendering judgment for his minor children on bond.

**8. Husband and wife ⚖︎273(12)—Evidence held not to show execution of trust deed of community property under duress.**

In suit to cancel trust deeds of community property as to interest of surviving children of

grantor and his deceased wife, evidence *held* not to show that deed was executed under duress.

## 9. Contracts ⚖➔100—What constitutes duress is matter of law.

What constitutes duress is a matter of law.

Appeal from District Court, Webb County; J. F. Mullally, Judge.

Action by Amelia Hemans Coleman and others against A. O. Coleman and others, in which the defendant named and others filed cross-actions. From the judgment rendered, the defendant named and others appeal. Affirmed.

Pope, Pope & Pope of Laredo, Cunningham, Moursund & Johnson, of San Antonio, and D. F. Rowe and R. D. Wright, both of Laredo, for appellants.

Mann, Neel & Mann, of Laredo, L. L. Mott, of Houston, M. A. Childers, of San Antonio, and Lewis Rogers, of Houston, for appellees.

COBBS, J. Amelia Hemans Coleman, Florence Augusta Coleman, and Anna Louise Coleman, a minor, sued their father, A. O. Coleman, their stepmother, Anna Coleman, E. Garcia, Payne Briscoe, Henry Edds, Federal Land Bank of Houston, and its trustee, M. H. Gossett. The plaintiffs sued their father upon his bond as community administrator, alleging that their mother, Anna A. Coleman, died June 29, 1909, and that on July 7, 1911, he executed such bond in the sum of $18,000, with defendant E. Garcia and T. A. Coleman as sureties, and duly qualified by taking the oath prescribed by law; that T. A. Coleman had died, insolvent and adjudicated a bankrupt; that such estate consisted of section 564 in Dimmit county, Tex., and sections 1392, 1394, 1396, and 1398 in Webb county, cattle to the value of $1,000 and horses to the value of $200; that said estate was appraised at $18,000; that their father had not faithfully administered said estate and had failed to pay them any part of the estate to which they were entitled, except small advances not exceeding $500; that the only indebtedness inventoried was 3%₄₀ of the purchase price of such land at $1 per acre, with interest at 3 per cent. per annum, amounting to not exceeding $2,396; that he sold the Dimmit county land and mortgaged the other land for his own personal use and benefit; that about March, 1923, he and his wife, Anna, executed a note for $7,289.52, dated March 14, 1923, payable to defendant Henry Edds, September 28, 1923, bearing 10 per cent. interest, and on March 30, 1923, executed and delivered to Payne Briscoe, as trustee, a deed of trust on the four sections of Webb county land to secure such note; that on September 11, 1923, they gave said Edds another note for $7,638.85 in renewal of the other note and to be secured by same deed of trust; that on March 30, 1923, they exe-

cuted to Payne Briscoe a deed of trust on the four sections in Webb county, to secure Stockyard Loan Company in the payment of three notes, two for $2,500 and the third for $2,345.89, each dated March 14, 1923, and due September 28, 1923, which notes are now claimed by said Henry Edds; that about March 8, 1919, said A. O. Coleman, reciting himself a widower, executed to Federal Land Bank and its trustee, M. H. Gossett, a deed of trust on said four sections, reciting that it was given to secure the payment of a note for $10,000, payable with interest on the amortization plan in 68 installments; that all of said deeds of trust apparently are unsatisfied, and said Edds is by cross-action seeking foreclosure of the first described two deeds of trust; that said deeds of trust were given to secure the payment of personal indebtedness of A. O. Coleman incurred after he qualified, and that Edds, Briscoe, and Stockyards Loan Company all had actual and constructive notice of that fact as well as the fact that the deeds of trust were given to secure pre-existing debts due by him to Edds. They further alleged that the money obtained from Federal Land Bank for the purpose of settling pre-existing debts of Coleman incurred by him personally after his qualification; that the only debt due by the community was the one to the state and it was paid out of the revenues from the community property.

Plaintiffs alleged that the deeds of trust were all void as to their half interest in the land; that Coleman had dissipated the estate and had failed to account. They prayed for the cancellation of the deeds of trust as to their half interest; that Coleman be required to account; that the property on hand be divided; that they have judgment on the bond for any balance found to be due them and not set apart to them.

The Federal Land Bank answered with exceptions, general and special, and with special answer and cross-action. It alleged: That on January 10, 1919, Coleman applied in writing for a loan of $10,000, representing that $9,300 thereof was for the purpose of paying off previous liens and the balance to be used in paying for stock in the Encinal National Farm Loan Association in the sum of $500, and to buy cattle. That the loan was made and proceeds applied to pay Mrs. Annie E. Chittim $7,500; First State Bank & Trust Company, $800; 100 shares of stock $500; and balance of $1,198 to Coleman. That the first two amounts were paid to satisfy liens on the land. That it paid said sums without any knowledge, actual or constructive, that Coleman had been derelict in his management of the estate. That Coleman had full power to incumber the estate. That the deed of trust was a valid lien. It prayed that plaintiffs take nothing, and that it recover its debt and for establishment of its lien.

⚖➔For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Edds and Briscoe answered by general demurrer, special exceptions, etc. They alleged the due qualification of Coleman as administrator, and the execution of the two notes to Edds and the deed of trust securing same, which deed of trust was alleged to cover any other indebtedness; that said debt has not been paid and said lien was in full force. They then alleged the execution of the three notes to Stockyards Loan Company, also described in plaintiffs' pleadings, aggregating $7,345.89, and the execution of the deed of trust securing same; that on March 14, 1924, the indebtedness on said notes had been reduced to $4,870.13 and two new notes were given, one for $2,500 and the other for $2,- 370.13, due June 16, 1924, which notes and deed of trust lien were transferred to Edds for value on July 29, 1924; that $2,076.70 remained unpaid on said notes. They then made similar allegations to those of the Federal Land Bank as to the power vested in Coleman and the validity of the liens and alleged want of any notice whatever on their part, or of the Stockyards Loan Company, that plaintiffs were claiming any right in said land at the time the deeds of trust were given. They prayed that plaintiffs take nothing and that Edds recover his debt and for foreclosure.

A. O. Coleman answered among other things urging exceptions to the petition, and answered that the Dimmit county land was erroneously placed in the inventory; that he held it in trust and received no consideration for same when he conveyed it; that while for a number of years he had acted as survivor of the community, he did not so act in signing the deeds of trust to Edds, and the debt was not a community debt; that the loan from Stockyards Loan Company was procured by Edds in order that he might receive the money in part payment for 211 cattle sold by Edds to Coleman, and the money was in fact all turned over to Edds. He then for further answer to and. cross-action against Edds pleaded that the balance claimed upon the notes was without consideration and paid and satisfied by reason of the following facts: That after giving Edds a mortgage on the 211 head of cattle, aggregating $13,805, he sold Edds cattle aggregating $8,352, and that Edds owed him $1,100 additional on cattle deals. He then pleaded duress and restraint on the part of Edds in obtaining the lien on the land, alleging accusations charging him with a felony and intimating that he expected to and would prosecute this defendant, whereby he was deprived of the power to act free of the force and coercion exercised by Edds. He further charged that he lost $1,350 on account of sacrifice of cattle on which Milmo Bank had a lien, which loss he charged was caused by malicious acts and conduct of Edds in threatening to foreclose on his land and cattle. He further alleged that Edds had made slanderous statements concerning him, charging him with doing away with cattle mortgaged to Edds, and of selling mortgaged cattle, for which he claimed actual damages in the sum of $5,000, and exemplary damages in a like sum.

E. Garcia answered by general demurrer and general denial, and answered that there was sufficient property to pay plaintiffs and that Edds and Briscoe had no interest in the lands, as there was no value paid at the execution of the deed of trust; that they had record notice of plaintiffs' rights; that the pretended lien was for a pre-existing debt, and was not for the benefit of the estate, but the personal benefit of Coleman. He adopted paragraphs 6 and 7 of plaintiffs' petition in which they attack all the deeds of trust. He then denied that the estate had any accruals or income, and that it had produced any revenue, and alleged that if any judgment be obtained against him on the bond he is entitled to judgment over against Coleman. He prayed that all deeds of trust be declared void and the property in the hands of Coleman be partitioned and that plaintiffs receive their one-half.

Plaintiffs by supplemental petition denied the allegation of Edds and Briscoe and Federal Land Bank and its trustee, and denied that Coleman had any right or authority to incumber their land by any trust deed, and denied that said parties had no notice that plaintiffs were claiming any right to the four sections at the time the deeds of trust were given, and alleged that the community administration was had and is still pending in Webb county, and that said defendants all had both actual and constructive notice of the interest of plaintiffs in said estate at the time of the giving of the deeds of trust, and knew that the proceeds were to be used by Coleman for his personal benefit.

Edds and Briscoe, in answer to the answer and cross-action of Coleman, pleaded a general demurrer, special exceptions, a general denial, a plea of limitation of two years against the claim charging slander, a denial of any duress, allegations asserting their liens similar to those contained in their answer to plaintiffs' petition, and a prayer similar to that contained in such other answer, with the addition that Coleman take nothing by his suit.

This case was tried with a jury, and after the evidence was in the court charged the jury giving his conclusions as to the rights of the parties and instructed a verdict accordingly, which was returned in the following language:

"We, the jury in the above-styled cause, find our verdict as follows: In favor of the defendant Federal Land Bank of Houston establishing the validity of its lien on the four sections of land in Webb county described in the deed of trust to M. H. Gossett, trustee, to secure a

loan of $10,000 to A. O. Coleman; said lien being prior to all other liens and claims on said four sections of land and now in full force and effect and not sought to be foreclosed in this proceeding. Also in favor of defendant Henry Edds and against A. O. Coleman for the sum of $12,483.90, together with foreclosure of the two deeds of trust securing same, wherein Payne Briscoe is trustee.

"We further find that the present value of the four sections of land in Webb county belonging to the community estate of A. O. Coleman and his deceased wife, the mother of the plaintiffs, is the sum of $20,205 and that A. O. Coleman received rents on said land in the sum of $1,677, being a total value of $21,882 as the value of said community estate, one-half of which the plaintiffs are entitled to recover in this suit, said half being the sum of $10,941. As the liens of the Federal Land Bank of Houston and Henry Edds exceed the total value of the land, and there are no other assets of the estate, we also find our verdict in favor of the plaintiffs Amelia H., Florence A., and Anna L. Coleman against the defendant A. O. Coleman, and against the defendant Eusebio Garcia, as his surety for the sum of $10,941, and in favor of Eusebio Garcia against A. O. Coleman for whatever sum he (Garcia) may be required to pay as such surety."

Judgment was rendered upon and in accordance with such verdict.

Appellants' propositions attacking the validity of the deed of trust of the Federal Land Bank of Houston, while lengthy, too lengthy to be copied, all involve the power and authority of A. O. Coleman, the survivor of the community estate of his deceased wife, to execute the deed of trust.

We discuss proposition No. 4 first because it involves the power of the survivor to execute the deeds of trust, and what we have to say on that subject will apply to the validity of the Henry Edds deed of trust, presented in the first proposition.

The first wife, Anna A. Coleman, whose community estate is in controversy, died on June 29, 1909. The community administration began July 7, 1911, and the inventory showed only one debt due by the estate, of $2,533.23, on the four sections of land in Webb county. A. O. Coleman qualified as community administrator on July 7, 1911. On March 8, 1919, A. O. Coleman, describing himself as a widower, gave the deed of trust upon the same land described in the pleadings to Gossett, trustee for Federal Land Bank of Houston, to secure the payment of the $10,000 note, payable upon the amortization plan, described in the pleadings and judgment.

The proceeds of the loan of $10,000 made by Federal Land Bank of Houston were applied as follows: Paid to Mrs. Chittim, $7,500; paid to the First State Bank & Trust Company, $800; stock in the Federal Land Bank, $500; stamps, $2; cash to Coleman, $1,198.

With reference to the check for $1,198 issued in favor of A. O. Coleman, he testified:

"When I got this $1,198 check, I do not know what I did with it; I think I instructed Mr. Link to pay the interest on that loan (meaning the Chittim loan); that is the interest item that I stated in the application, amounted to about a thousand dollars. Out of the Federal Land Bank $10,000 I had $60 coming to me. After settling up it paid the Chittim loan, my First State Bank & Trust Company loan, and my stock in the National Farm Loan Association, and I had $60 left."

The application by Coleman to the Federal Land Bank showed that the loan applied for was to be used for the following purposes: To buy cattle, $200; mortgage, $7,500, interest on same, $1,000; second lien, $800; stock in association, $500—total $10,000.

The deed of trust to secure the $4,000 to First State Bank & Trust Company of Laredo is dated August 4, 1911.

These loans were made by Coleman to pay off debts incurred by him and the estate, and in handling and buying cattle and other expenses incurred by him in and about the management of the trust. He was a cattle raiser and knew of no other kind of business to earn a living and to support his family, and he incurred heavy losses in the depression of cattle values. He managed the estate in good faith and to the best of his ability, however badly it resulted. He stated:

"About a month or a little over after I qualified I gave a deed of trust for $4,000 to the First State Bank & Trust Company at Laredo. That money was used to pay for cattle with. I was buying those cattle for myself to make a living for my family. Then in 1913 I executed another deed of trust and the one covering the $4,000 was released, and the one for $5,100 was given. That was to cover the same indebtedness and carry on the business. Then, in 1915, a $15,000 loan was created on eight sections of land, including my four sections. I received one-half of that loan. That money was used in just carrying on the cattle business. It went on in the business taking up the old notes and carrying on the business."

The record in this case discloses no fraud in the management of the estate. On the contrary, it was administered as he would have done had there been no death of his wife and no community interest of others. It was just an illustration of a failure, where some men succeed and others fail, either on account of bad judgment or bad luck.

A. O. Coleman followed the strict and very plain statutes, beginning with article 3661 et seq. providing for community administrations, which gave him the exclusive management, control, and disposition of the community property in the same manner as during the wife's lifetime. He gave the bond required by article 3667, conditioned "that he will faithfully administer such community estate, and pay over one-half the surplus there-

of after the payment of the debts with which the whole of such property is properly chargeable to such person or persons as shall be entitled to receive the same"; which was approved by the probate court, and the estate turned· over to him, in the language of the statute, to "have exclusive management, control and disposition of the community property in the same manner as· during her lifetime."

[1] As supporting the right to borrow money and incumber the estate with deeds of trust in the administration thereof, we quote from the case of Jordan v. Imthurn, 51 Tex. 276:

"It is shown by the statement of facts that the debt sought to have been secured by the trust deed originated in a commercial transaction entered into by the surviving husband, Charles H. Jordan, after the death of the first wife, Caroline E. Jordan, and who was the mother of the two minor defendants, Charles and Frederika Jordan, and with which transaction the community estate was in no way concerned."

The court sustained that deed of trust, holding it to be a valid obligation against the whole of the community estate. The facts in that case ·show that Jordan was operating business in Galveston. His wife died, and he qualified as community administrator in the manner required by law on August 15, 1870, and on June 5, 1873, he executed the mortgage involved in that case to secure the plaintiffs. The last paragraph on page 287 reads:

"The power of general disposition over the community, given by statute, would contain the lesser power to incumber it; and we do not think that· there was error in so much of the judgment below as held the deed of trust valid to the extent to incumber the community property as such."

We only quote from this case as it clearly illustrates the doctrine, but the doctrine there laid down is well supported by the following authorities: Dawson v. Holt, 44 Tex. 174; Cordier v. Cage, 44 Tex. 532; Leatherwood v. Arnold, 66 Tex. 414, 1 S. W. 173; Johnson v. Taylor, 43 Tex. 121; Watkins v. Hall, 57 Tex. 1; Huppman v. Schmidt, 65 Tex. 583. An interesting discussion of the question involved is contained in the opinion written for this court by the late Chief Justice James in Drought v. Story (Tex. Civ. App.) 143 S. W. 361. Writ of error to Supreme Court was refused. Also Ostrom v. Arnold, 24 Tex. Civ. App. 192, 58 S. W. 630; Tholl v. Speer (Tex. Civ. App.) 230 S. W. 453. There is no testimony at all to show maladministration or fraud committed by the administrator. The testimony of the bank and of the administrator himself all show entire good faith—only unfortunate management.

[2-5] It is obvious there was no intention by the Legislature to make any change of the well known and well understood rights of the husband to administer the community estate, except that he be required to give bond to preserve the rights of the parties inheriting the, wife's part and to keep accurate accounts. The community estate found its origin in the civil law, and was handed down from those governments such as Spain, Mexico, and France, functioning under the Code of Napoleon. It still exists in Louisiana and several states that were once under French and . Spanish sovereignty. To acquire a 'broad knowledge of its system we are required to go to its origin and the administration and construction such as will be found in McKay in his work on Community Property, and the various decisions.of this state on the subject. The words community property with us are such as relate to property owned in common between the husband and wife, a kind of marital partnership, and by our statutes defined in article 4619, R. S. Of such property, both under the civil law and our statutes pertaining thereto, the husband has always had the control and power of disposition, and his dealings with such has always appeared to be final and conclusive where there are no restrictions. The wife seems to have had only the right of partition upon the termination of the marital rights. So if she died and left children such rights survived in the children, subject to the management, control, and ultimate disposition of the property by the father.

[6] As said in Leatherwood v. Arnold, 66 Tex. 414, 1 S. W. 173:

"It results necessarily from his unbridled discretion and unlimited power, that he cannot be required to account as other trustees. * * * Inquiry into the details of his administration is inconsistent with the breadth of his power and ·discretion. Whether he has done well or ill depends on no particular act, but on the general result."

As said in Huppman v. Schmidt, 65 Tex. 583:

"His manipulation of the trust is not an administration pending in any court. Article 2172 (Rev. St.). He is not the agent, or hand, or officer of any court. No probate decree is the source of his authority, and the exercise of his discretion is under no judicial warrant or control, as in cases of ordinary administration. If the heirs of the deceased partner invoke the jurisdiction of the probate court to effect a distribution, when a survivor has fraudulently concealed or squandered their inheritance, that jurisdiction may .discover, but cannot remedy, the wrong. The bond, their only source of indemnity, must be proceeded upon in the court having jurisdiction of the amount."

The statute as shown did not diminish his power, but if anything enlarged it. It follows from what we have said that the deed of trust given the Federal Land Bank of Houston is entirely valid and the trial court did not err in so holding. Having passed upon the power of the survivor, we make the same holding in

regard to the two deeds of trust held by Henry Edds and his trustee Payne Briscoe.

We will now dispose of the appellees herein, Amelia Hemans Coleman, Florence Augusta Coleman, and Anna Louise Coleman, who have, by writ of error, upon agreement of all parties, joined in the appeal so far as same seeks to cancel the Federal Land Bank's deed of trust and the two deeds of trust held by Henry Edds and his trustee, Payne Briscoe, and a supplemental transcript has been filed in this cause covering the assignments of error, etc., involved in their appeal, but these appellees are here and now resisting all the propositions in appellants' brief that seek to charge against their interest in the estate or against them in their judgment against the bondsman, E. Garcia, any part of the $2,533.-29 community debt which they claim is still due and unpaid.

Anna Augusta Coleman, the mother of these appellees, died June 29, 1909, and appellant A. O. Coleman qualified as community administrator of the estate of himself and Anna Augusta Coleman, deceased, July 7, 1911. The statutory inventory showed four sections of land in Webb county as belonging to the estate, and listed as the only community debt $\frac{39}{40}$ of the purchase price of this land from the state at $1 per acre. This amount due the state, together with the patent fees, has been calculated to be $2,533.23, and was so treated throughout the case, as will appear from the briefs of all parties as well as the testimony in the case.

The statutory inventory also listed as belonging to the community estate one section of land in Dimmit county, survey No. 564, Southern Pacific R. R. Company, purchased from the state by W. M. Vivian, and valued same at $6,400. The statutory inventory likewise listed as belonging to the community estate cattle to the value of $1,000 and horses to the value of $200.

We have examined the evidence and find that it sustains the verdict of the jury and the judgment of the court.

[7] The survivor kept no account as is required by article 3670, R. S. 1925, showing a fair and full account and statement "of all community debts and expenses paid by him, and of the disposition made of such community property; and, upon final partition of said estate, shall account to the legal heirs of the deceased for their interest in such estate, and the increase and profits of the same, after deducting therefrom all community debts, unavoidable losses, necessary and reasonable expenses, and a reasonable commission for the management of the same."

It was shown that the property belonging to the community estate was largely used in a way to pay debts incurred somewhat largely by the survivor individually, and, having made no satisfactory report or accounting, the court was justified in treating the only community debt existing at the time the bond was given as having been extinguished and in protecting the minor children from the effect of his administration of their community funds by the judgment in favor of the children on the bond.

For the reasons given, we overrule the contention that the deeds of trust should be canceled. But we affirm the judgment otherwise in their favor on the bond against A. O. Coleman and E. Garcia for the full sum of $10,941, with interest, with judgment over against A. O. Coleman in favor of E. Garcia for whatever amount thereof he may be required to pay.

[8] The claim that Coleman executed the deed under duress is not supported by the testimony. Coleman sold some of the cattle covered by the first mortgage, which displeased Edds, who demanded more security, and said, "I could send you to the pen; if you do not give me a deed of trust for that land I will close you out." Coleman further testified:

"Now the second deed of trust when I divided part to the Stockyards Loan Company and part to Mr. Edds came about this way: He came out to the ranch; it was in 1922, and it was very dry, and I had been having lots of trouble, and the cattle were poor, and he said, 'These times are hard; we will have to help each other. I can get you some cheaper money from the Stockyards National Bank.' So he fixed up the notes and papers, and he talked like he was going to help me along, and I was glad to do anything to get along, so we fixed it up that way."

Coleman had in his pocket the price of the sold cattle, and asked to be allowed to keep the money, saying:

"He wanted to pay out of his interest; that his interest was due, and he wanted this money or needed this money. So when we came back, I do not remember, there might have been several words said, but I remember I told Mr. Coleman, 'Don't you know it is a violation of law to sell mortgaged stuff and use money and apply it on other stuff than the indebtedness?' And he said, 'Well; I wrote to you asking permission to use this money.' I said, 'Well; I did not receive your letter.' During the conversation he insisted that I let him have this money, and I finally agreed to let him use the money. Conditions were pretty hard at that time. I thought it was best for him to use it. I did not threaten Mr. Coleman to send him to the penitentiary on December 27, 1921, I have not detailed all that was said about the business there at that time; I guess I could not repeat all that was said. There was quite a lot said there. I have no recollection of at any time, as Mr. Coleman testified here, telling him that I could send him to the penitentiary. It is pretty hard to put a man in the penitentiary sometimes. When I had this conversation in front of the Club Café, Mr. Coleman did not that day agree to give me an additional deed of trust. I mean to tell this jury now that I released those cattle without any promise from Coleman. I asked him if he

did not know he had violated the law. I thought he had violated the law, and I think he did when he kept the money and did not turn it in."

[9] Coleman was allowed to keep the proceeds of the mortgaged cattle. He thereafter executed the second deed of·trust as further security. What Coleman was seeking was additional time, and what Edds was seeking was additional security, and they both got what they were after. What constitutes duress is a matter of law. Especially was there no duress when we take into consideration the time that elapsed between the alleged duress and the execution of the deed of trust, at which time Edds was not present. Houston Ice & Brewing Co. v. Harlan (Tex. Com. App.) 228 S. W. 1090; Trigg v. Shelton (Tex. Com. App.) 249 S. W. 215; Robertson v. Lee (Tex. Com. App.) 249 S. W. 220; Landa v. Obert, 45 Tex. 548; 9 R. C. L. 716; Railway v. Graham (Tex. Civ. App.) 145 S. W. 632.

A careful consideration of all the assignments presented and propositions of law challenging the court's charges given and refused, and the verdict of the jury supported by the facts, shows no error assigned that should cause a reversal, and the judgment is affirmed.