## KIRKLAND et al. v. OIL INV. CO. et al.
### No. 12454.

Court of Civil Appeals of Texas. Fort Worth.
April 18, 1931.

B. Y. Cummings and Fischer & Fischer, all of Wichita Falls, for appellants.

Weeks, Morrow, Francis & Hankerson, of Wichita Falls, for appellees.

CONNER, C. J.

This suit was instituted by Lloyd Kirkland, for himself and as next friend for his minor brothers and sisters and Clara Miller and Lavelle Muldrow, joined pro forma by their respective husbands, against the Oil Investment Company and others, to recover an undivided one-half interest in 1,507.4 acres of land situated in Archer county, Tex., which had been purchased by said Oil Investment Com-

pany from L. J. Kirkland, the mother of plaintiffs. Since the date of its purchase, to wit, April 7, 1923, it was alleged that the investment company had been in possession of the property, and to have unlawfully removed from and under said land crude oil during the respective years since the date of its possession of the reasonable value of $270,006.50, one-half of which plaintiffs sought to recover by virtue of an alleged undivided one-half interest in the land. Plaintiffs further alleged that since April 7, 1923, the investment company had conveyed to divers and sundry third persons and corporations, who were innocent of the plaintiffs' rights, oil and gas leases, and collected rentals thereupon, appropriating the proceeds amounting to $51,949, one-half of which they also sought to recover, less the sum of $12,000, alleged to be one-half of the mortgaged indebtedness upon said land, which the defendant Oil Investment Company paid off at the time it took possession.

In addition to demurrers and a general denial, the defendants specially pleaded that R. C. Kirkland was the husband of L. J. Kirkland, now Mrs. L. J. Nickol, and that the plaintiffs are children of the marriage of R. C. and L. J. Kirkland; that R. C. Kirkland died on January 6, 1923, and that for several years prior to said death, L. J. Kirkland, the wife, was the owner of the land described in the plaintiffs' petition; that she continued to be such owner until the sale of the land to the defendant Oil Investment Company. That at the time L. J. Kirkland acquired said land, it was mortgaged to the Texas Land & Mortgage Company for about the sum of $17,500, which debt was assumed by the said L. J. Kirkland. That prior to the death of R. C. Kirkland, said loan and interest note was long past due, and payment thereof was being pressed at the time of the investment company's purchase, whereupon, in answer to the suggestion, and to avoid total loss, L. J. Kirkland qualified as community administrator and sold the land to the defendant investment company at $20 per acre, making conveyance for herself individually and also as community administrator. It was further alleged that L. J. Kirkland, in making said sale, and the investment company making the purchase, acted in good faith and without design of defeating any right of the plaintiff children.

The land in question was conveyed by general warranty deed to Mrs. L. J. Kirkland by W. R. Pace and Mary E. Pace on the 17th day of July, 1914. The conveyance recited that it was for Mrs. Kirkland's "sole and separate use." At the time, the land was incumbered by a mortgage due the Texas Land & Mortgage Company, Limited, of Dallas, in the sum of $17,500, which was assumed by Mrs. Kirkland as part of the consideration. Later on, to wit, the 28th day of September,

1914, R. C. Kirkland, by warranty deed and for a recited consideration of "$5,000 cash and the further consideration of the love and affection I have for my wife, the said L. J. Kirkland," conveyed the land to Mrs. Kirkland "for her sole and separate use." Nothing having been paid upon the indebtedness to the mortgage company, R. C. and L. J. Kirkland secured an extension, maturing the indebtedness on January 5, 1920, 1921, 1922, and 1924, and $11,500 on January 5, 1926, all to bear interest from January 5, 1917. Both L. J. and R. C. Kirkland bound themselves in the extension agreement for the payments there specified. Neither principal nor interest on the indebtedness due January 5, 1920 or 1921 or 1922, had been paid at the time of the sale to the appellee investment company, so that at that time there was some $6,000 principal, plus interest on the indebtedness, due and unpaid.

Beginning with July 21, 1922, prior to the death of R. C. Kirkland, which, as stated, was on January 5, 1923, and up to March 9, 1923, when Mrs. L. J. Kirkland contracted with the investment company for the sale of the land at $20 per acre, the mortgage company wrote and received some 71 letters to and from various and sundry parties, including Mr. Kirkland, Mrs. Kirkland, W. E. Forgy, an attorney at Archer City, A. A. Cooper, a land agent at Olney; E. C. Stovall, a land agent and owner near Graham; and Stehlik & Baber, land agents at Wichita Falls; and Z. T. Burkett, friend and adviser of Mr. and Mrs. Kirkland, who, for Mrs. Kirkland, negotiated the sale after Mr. Kirkland's death. These letters are too voluminous to set forth, but they, without dispute, show that the mortgage company was pressing for payment, and that, unless Mrs. Kirkland could provide payment by a sale of the property, there was danger of its total loss to her. Z. T. Burkett, a stock farmer, testified to the effect that he lived near the home of the Kirkland's, was an intimate acquaintance of Mr. Kirkland, and in daily attendance upon him most of the year preceding his death, and had discussed with him, prior to the time he became very ill, his situation with reference to the land and mortgage against it, and his desire to sell the land; that at the time of Kirkland's death, and for several months before, "he had $20.00 an acre on it"; that the situation had been frequently discussed with Mrs. Kirkland after Mr. Kirkland's death, and at various times she expressed herself to the effect that she would be willing to close a sale on that basis at any time. There was also evidence tending to show that for some time efforts by various parties had been made to secure a purchaser of the land at $20 per acre, and that several people had visited the land and viewed it and refused to buy at that price, and that the first buyer's effort to purchase at that price

was that of the Oil Investment Company. Mrs. Kirkland testified, among other things, that: "I sold the property because I was afraid I would lose it; I knew I wasn't getting what I ought to have, but I was afraid I would lose it and maybe not even have a home for myself and children. I was afraid if I did not take what they offered I might not get anything."

The evidence also shows that Mr. Burkett was the confidential adviser of Mr. Kirkland before his death, and of Mrs. Kirkland thereafter; that Mrs. Kirkland was not experienced in business, and that, as she testified, she was "leaving everything to Burkett as I didn't know what to do or how to start to do anything." The evidence further tends to show that Burkett, with the assistance perhaps of Mr. Stehlik, a land agent of Wichita Falls, interested the officers of the appellee investment company, who were told by Burkett that they could have the land if closed at once at $20 per acre; that the officers of the company and Stehlik and Burkett repaired to the residence of the Kirkland's and the offer by the company of $20 per acre was made and accepted by Mrs. Kirkland. No evidence has been called to our attention that Burkett had any pecuniary interest in the matter whatever, but Mrs. Kirkland testified that, immediately prior to the offer in behalf of the investment company, a Mr. Griffin also appeared and offered $21 per acre, free of commissions, with reservation on her part of royalty interest in the land, and build a house in town for her upon a lot that he would buy; that she wanted to take this, but that Burkett insisted that their word was out, giving the investment company an option to purchase at $20 per acre, and that he did not think Griffin's offer was made in good faith; that while Griffin had stated that he desired to buy the land for grazing purposes, that as a matter of fact, he, Burkett, thought that he desired to tie the matter up by contract, offering to give a deposit, until he could learn the result of an oil well that was being drilled some mile or mile and one-half distant, and that he thought the offer of the investment company should be accepted and the chance of a sale not lost, and that she had finally signed the contract with the investment company. Color perhaps of good faith on Burkett's part in his statements referring to Griffin was shown by evidence to the effect that Griffin had had frequent differences and frequent cases of litigation with individuals with whom he dealt; that after being informed of the Griffin offer, he, Burkett, visited the well being drilled, that had been referred to, and found that they had abandoned it; that it in fact was a dry hole.

In relation to the title held by Mrs. Kirkland, which appellees insist was vested in her solely, Mrs. Kirkland testified, among other things, substantially that the survey sold had been acquired by an exchange therefor of five pieces of property, all in the name of Mr. Kirkland, except one given to her; that not a dollar of her money was put into the land; that all of the property exchanged for the ranch in question was acquired after their marriage; that the deed was made in her name for two reasons; that Mr. Kirkland was having trouble in making payments on some indebtedness on property in Corpus Christi and "he thought he would be sued, and by putting it in my name we would have a home left; also I did not want to come to this country, and he told me he would deed the property to me if I would be satisfied." That later the Corpus Christi indebtedness was paid and the property in question put back "into Mr. Kirkland's name and my name due to the fact that my husband had some business dealings in which some questions arose as to why the property was in my name, as the parties dealing with my husband thought it was community property. They told my husband that it should be back in the community name, so Mr. Kirkland made a deed to his father and then his father deeded it back to us. Mr. Kirkland and I executed a deed back to Mr. Kirkland's father and then he deeded it right back, as it had to go through a third person. I don't know what became of the deed. * * * The men we were dealing with took the deeds to be recorded or sent Mr. Kirkland or I, I couldn't say which one took them. I thought the deeds were recorded until later. In the fall before Mr. Kirkland died, he had the abstract on the land brought down to date and the abstract didn't show that deed. We then drew up a deed before he got worse and the deed was at the bank, but at that time he was unconscious at all times and it was never completed, so at his death it was left in my name. By reason of the deed not being recorded, it was left in my name. I don't know where those two deeds are now. I have never seen them since I signed them."

In this connection, it should be said that there is no evidence showing or tending to show that the contracting officers of the investment company had notice that the land in question had been acquired by exchange of community property, or that Mr. and Mrs. Kirkland had at any time ever executed a deed to the father of Mr. Kirkland, or that later the father had reconveyed the land to Mr. and Mrs. Kirkland so as to constitute it community property, unless, as appellants insist, they were put upon inquiry as to the community character of the land by the fact to which we shall now refer: That Mrs. Kirkland, after the execution of the contract with the investment company, was upon her application regularly appointed community administrator of the estate of herself and husband, and later, in executing the deed to the investment company, did so in her own right, and also signed as community administrator.

The evidence shows that the appointment of Mrs. Kirkland as community administrator was at the suggestion of the mortgage company. As to this, among other things, Mrs. Kirkland (Mrs. Nickol) testified that: "After Mr. Kirkland's death, when I came to Archer City to qualify as community survivor, Judge Forgy (acting for the mortgage company) fixed up the papers. I don't know just what I told him about the deeds, etc., but I asked him why I must be made executor when it was left in my name, and he told me it was community property; that we had lived together and accumulated it together and for that reason it was community property. Everyone told me I could not handle the property without being appointed administrator."

Mr. Forgy, it appears, was not familiar with the status of the title, and Mrs. Kirkland testified that at the time she went to sign the contract for the sale of the land, Mr. Fowler, one of the appellees, "asked me at that time if I had been appointed administrator. I asked him why that made any difference. The land was left in my name. He then said because the boys might grow up and some time sue for their part. That was all the conversation I had with any of them. I said the land was in my name because the deeds were not put of record and the original deed showed in my name."

The fact of Mrs. Kirkland's appointment as community administrator was presented to appellees in the opinion given by Mr. Hankerson, of the law firm of Weeks, Morrow, Francis & Hankerson, of Wichita Falls, to whom the abstracts of title were submitted for examination after the contract for the sale and before the closing of the same. The opinion in relation to this matter reads thus: "R. C. Kirkland seemed to have died in January of this year and Mrs. L. J. Kirkland has taken out a community administration. The property appears to have been the separate property of Mrs. L. J. Kirkland. It was deeded to her by Pace, and R. C. Kirkland also deeded his interest to her. But it is listed by the appraisers as her part of the community. She seems to have qualified as such community survivor. We suggest that in accepting deed from her, that she make the conveyance to you both individually and as community survivor, and that the deed also recite that she is selling said property for the purpose of paying the debts of the community."

Other testimony, if thought to be necessary, will be stated in connection with our further discussion of the case.

The case was submitted to a jury upon twenty special issues, of which the jury answered the following:

"Special Issue No. 1: Do you find from a preponderance of the evidence that Z. T. Burkett, in advising Mrs. L. J. Kirkland to execute the contract with the Oil Investment Company, was acting in bad faith toward her and her children? Anwer as you find the facts to be. Answer: No.

"Special Issue No. 2: Do you find from a preponderance of the evidence that Mrs. L. J. Kirkland in making the contract with the Oil Investment Company, acted in bad faith toward her children? Answer as you find the facts to be. Answer: No.

"Special Issue No. 3: Do you find from a preponderance of the evidence that R. C. Kirkland and wife executed and delivered to the father of R. C. Kirkland the instrument referred to by Mrs. Kirkland as a deed, covering the property in question? Answer as you find the facts to be. Answer: No.

"Special Issue No. 17: Do you find from a preponderance of the evidence that Mrs. L. J. Kirkland at the time in question believed the statements made to her by the said Burkett with reference to the Griffin offer to be true? Answer as you find the facts to be. Answer: Yes."

The jury reported that they were unable to answer the remaining issues, whereupon the defendants moved the court to discharge the jury and enter judgment in their favor upon the answers returned. The motion was granted, and judgment entered accordingly, to all of which the plaintiffs excepted and later presented their motion for new trial, which, being overruled, they thereupon duly prosecuted the present appeal.

Appellees insist that the legal title to the land in controversy at the time of the sale in question was in Mrs. L. J. Kirkland, and that the same was her sole and separate property, and, if so, that the appellant children have no such interest as to entitle them to the recovery sought, and we find ourselves in agreement with this contention. It is to be noted that Mrs. Kirkland, now Mrs. Nickol, is not a party to this suit and is not making any legal effort in her own behalf to set the sale aside. On the contrary, as will hereinafter be more fully shown, she received from the land in controversy several thousand dollars in excess of the indebtedness resting thereon. Of this excess she invested some $2,500 in property in Archer City, taking the title in her own name and not as community survivor. It further appears that there was later found to be an excess in the survey of land in controversy, and this she recovered and utilized by making leases and otherwise in her own name and right. With us, the most convincing evidence of title to land is the written instrument conveying the same, and this evidence of title in Mrs. Kirkland is presented in the original deed from W. R. Pace and wife, in which it is expressly stated that the conveyance is for her "sole and separate use." In addition to this, the husband himself, as he undoubtedly had the power to do, formally executed conveyance declaring it

to be for the sole and separate use of his wife. The fact that she listed the land in the administration proceedings as community property cannot be given the legal effect of divesting her separate right. It was expressly decided by our Supreme Court in Koppelmann v. Koppelmann, 94 Tex. 44, 57 S. W. 570, that the act of a surviving husband in placing lands on the inventory of property held in common with the deceased wife, on giving bond to administer and account for it as survivor, would not estop him, in a suit by the heirs against him and his bondsmen, from showing that it was in fact his separate property. In the case of Kahn v. Kahn, 94 Tex. 114, 58 S. W. 825, it was held that, where a deed from the husband to the wife clearly expressed an intention to make the property conveyed her separate estate, parole evidence was not admissible without proof of fraud or mistake in the recitals to show that the grantor did not intend to convey to her as her separate property. To the same effect is the case of Johnson v. Johnson, by this court, 147 S. W. 1167.

■ Nor do we think the fact that R. C. Kirkland, the husband, bound himself, together with his wife, in the extension agreement made with the appellee mortgage company, as hereinbefore cited, divested the separate estate of Mrs. L. J. Kirkland. This indebtedness was assumed by Mrs. Kirkland in the original conveyance to her as a part of the consideration therefor, and, as between the husband and wife, the debt continued to be hers and not that of the community. We see no reason why as between those two the husband would not have been entitled to reimbursement out of the wife's separate estate had he been required to pay the debt for which he obligated himself in the extension agreement. See Fox v. Kroeger (Tex. Sup.) 35 S.W.(2d) 679. In this connection, it is to be also borne in mind that there was an express finding by the jury that Mr. and Mrs. Kirkland did not in fact convey the land to the father of R. C. Kirkland, and he convey the property to the Kirklands as a part of their community estate, and the sufficiency of the evidence to sustain this finding is not questioned by any assignment of error in behalf of appellants. Nor do we think effect can be given to testimony by Mrs. L. J. Kirkland that the land was originally conveyed to her in order to avoid hazard from the Corpus Christi indebtedness. It was held in Scarborough v. Blount, 154 S. W. 312, 313, by the Galveston Court of Civil Appeals, that where a person conveyed land by a deed absolute on its face and without consideration, in fraud of his creditors, although with an understanding that the land is only to be held in trust, that neither he nor his heirs could enforce the trust against a grantee or purchaser from the grantee, even though such grantee might have notice of the fraud; the ruling being that such conveyances are subject to impeachment only by subsequent creditors and purchasers without notice. In the case before us there is neither finding nor evidence that the appellee investment company had notice of the trust, if any, indicated by this testimony of Mrs. Kirkland's. On the contrary, there is an express finding by the jury, which is not assailed, that the investment company in the purchase acted in good faith.

In Lewis v. Simon, 72 Tex. 470, 10 S. W. 554, it is held that a voluntary conveyance by husband to his wife of land, the community property of the parties, vests the land in her in her separate right and as her separate property. It is also said in the later case of Evans v. Opperman, 76 Tex. 293, 13 S. W. 312, that it is well settled that the husband may make a gift to the wife of the community property so as to make it her separate estate. See, also, Kahn v. Kahn, 94 Tex. 114, 58 S. W. 825. So that, as stated in the beginning, we think the deeds to Mrs. Kirkland vested in her, as the appellee investment company insists, full title to the property in question.

■ Nor do we think that the relief sought by appellants can be granted them on the theory upon which they base their right to recover. At the time of the appointment of Mrs. L. J. Kirkland as community administrator of the community estate of herself and husband, authority therefor was given under the terms of the statute. See Vernon's Sayles,' vol. 2, article 3595. As such, she had full power of alienation under article 3600 of that statute. See Pierce v. Gibson, 108 Tex. 62, 184 S. W. 502, 1 A. L. R. 1675; James v. Turner, 78 Tex. 241, 14 S. W. 574; Carter v. Conner, 60 Tex. 52; Moody v. Smoot, 78 Tex. 119, 14 S. W. 285. As held by the Court of Criminal Appeals in the case of Pate v. State, 54 Tex. Cr. R. 491, 113 S. W. 757, this power is absolute and will extend to the conveyance of an oil and gas lease. See Tholl v. Speer (Tex. Civ. App.) 230 S. W. 453. In this case, we held that a suit by the heirs of a wife to cancel an oil and gas lease, made by the husband as community administrator, on the ground that the court was without jurisdiction to appoint an administrator, because there were no community debts, was a collateral attack on the order of appointment. This case was also cited with approval in Coleman v. Coleman (Tex. Civ. App.) 293 S. W. 695, writ of error refused, where it is said among other things, by the San Antonion Court, that a husband, having unlimited power in the administration of the community estate, could not be required to account as other trustees. Indeed, in the absence of appointment of community administrator, the surviving spouse, as such, has power to sell and convey community property for the payment of debts, if done in good faith, and the purchaser is not required to see that the

proper distribution of the proceeds is made. See Sanger v. Moody's Heirs, 60 Tex. 102; Stone v. Jackson, 109 Tex. 385, 210 S. W. 953; Ashe v. Yungst, 65 Tex. 631; Fagan v. McWhirter, 71 Tex. 567, 9 S. W. 677; Cage v. Tucker's Heirs, 14 Tex. Civ. App. 316, 37 S. W. 180; Clemmons v. McDowell (Tex. Civ. App.) 5 S.W.(2d) 224, 225.

In the inventory filed in the Probate Court and sworn by the appraisers and Mrs. Kirkland, the land involved was valued at $23,000. Other property, such as cattle, horses, mules, machinery, goats, note, and money in bank, was valued at $1,925, thus making the total value of the entire estate $24,826.50. The total indebtedness then existing amounted to $23,150, leaving a net estate of $1,676.50. The sale to appellees at $20 per acre amounted to $30,140. The indebtedness paid by the sale amounted to $23,150. The amount received in excess of the indebtedness was $6,990, of which only one-half could be recovered by the children. The evidence shows that Mrs. Kirkland invested $2,250 in 20 acres of land near Archer City, taking the title in her own name and not as survivor of the community. The remainder of the money, together with certain other moneys received from insurance and personal property, she used for living purposes. For one-half of the excess, the children must look to the mother's bond, the established rule being that the purchaser is not to be held liable for the proper distribution of such an excess. See Sanger v. Moody's Heirs, supra, and other cases above cited.

It is evident that, exclusive of the land in question, the property inventoried was insufficient to pay off the scheduled indebtedness, so that in no event can it be said that some disposition of the land in controversy would not be necessary. If the sale was in good faith, the fact that it brought more than the debt is immaterial. See Clemmons v. McDowell (Tex. Civ. App.) 5 S.W.(2d) 224, 225. As noted in the beginning, the sale under consideration was found to have been made in good faith on the part both of Mrs. Kirkland and of the appellee Oil Investment Company, and the sufficiency of the evidence to support these findings is not questioned. Mere errors of judgment on the part of Mrs. Kirkland and of her adviser Burkett in accepting the offer of the appellee Oil Investment Company rather than that of Griffin cannot be given the effect of invalidating the sale, nor can circumstances merely tending to show that Mrs. Kirkland was influenced to act by reason of any false statement on the part of any of the actors other than those acting for the investment company, and of which the investment company was without notice, have the effect of nullifying the title conveyed. The unanswered issues, we think, were either only evidentiary in character or immaterial, and hence the trial court was authorized to disregard them and enter judgment as he did under the finding of the jury returned and the undisputed facts.

It is accordingly ordered that all assignments of error be overruled, and the judgment affirmed.