## HOUSTON ICE & BREWING CO. v. HARLAN. (No. 225–3395.)

(Commission of Appeals of Texas, Section B. March 16, 1921.)

1. **Deeds ⚖=71—Threat to resort to civil proceeding to enforce rights not duress.**

A threat by employer to resort to fidelity bond to indemnify it for loss occasioned by embezzlement on part of employee did not constitute duress such as would require the cancellation and annulment of a deed made by employee's wife to her homestead, although the inevitable result of carrying out the threat would be to put in motion the processes of the criminal law; employer not intending to exact an unconscionable bargain.

2. **Deeds ⚖=78—Evidence of duress in obtaining deed held insufficient to go to jury.**

In an action by a married woman to have canceled and annulled a deed alleged to have been executed under duress, evidence held insufficient to warrant submission of issue of duress to the jury.

Error to Court of Civil Appeals of Ninth Supreme Judicial District.

Action by Clara J. Harlan against the Houston Ice & Brewing Company. From a judgment of the Court of Civil Appeals (212 S. W. 779) reversing a judgment for plaintiff, defendant brings error. Judgment of district court and judgment of Court of Civil Appeals reversed, and judgment rendered for defendant.

Barry & Burges and Orgain, Butler, Bolinger & Carroll, all of Beaumont, for plaintiff in error.

W. R. Blain, Geo. C. O'Brien, and R. L. Durham, all of Beaumont, for defendant in error.

KITTRELL, J. The terms "plaintiff" and "defendant" will be applied to the parties as they were in the district court. Plaintiff, Clara J. Harlan (her husband not joining in the action), recovered judgment against defendant, Houston Ice & Brewing Company, in the district court of Jefferson county can-

celing and annulling a deed to her homestead which she alleged had been executed under duress.

That judgment was affirmed by the Court of Civil Appeals of the Ninth Supreme Judicial District, but on motion for rehearing was reversed on the ground that the evidence preponderated against the allegation of duress, and on the further ground of improper argument of counsel for plaintiff. 212 S. W. 779. Not content with obtaining reversal and remand, defendant has brought the case to this court on the sole ground that there was no evidence justifying the submission of the question of duress to the jury.

The grounds upon which plaintiff in error contends that the evidence fails to show any duress may be reduced to the following contentions:

First, that to threaten prosecution of one who is guilty of a crime is not an unlawful act, and therefore cannot constitute duress.

Second, that the evidence in this case does not show any threat of prosecution of Harlan, either directly or indirectly, but at most only warrants the conclusion that Autrey threatened to resort to the surety to make good Harlan's defalcation, which was a legal right or remedy available to the brewing company, the exercise or threatened exercise of which could not constitute duress.

Upon the first proposition above there are two lines of decision. The rule in England and in most of the American states, is that, to constitute duress by threat of imprisonment, it is not essential that the party threatened be innocent of the offense charged. Probably the leading case in this country holding this view is Morse v. Woodworth, 155 Mass. 233, 27 N. E. 1010, 29 N. E. 525, in which the reason for the conclusion reached is embraced in the following quotation:

"It has sometimes been held that threats of imprisonment, to constitute duress, must be of unlawful imprisonment. But the question is whether the threat is of imprisonment which will be unlawful in reference to the conduct of the threatener who is seeking to obtain a contract by his threat. Imprisonment that is suffered through the execution of a threat which was made for the purpose of forcing a guilty person to enter into a contract may be lawful as against the authorities and the public, but unlawful as against the threatener, when considered in reference to his effort to use for his private benefit processes provided for the protection of the public and the punishment of crime. One who has overcome the mind and will of another for his own advantage, under such circumstances, is guilty of a perversion and abuse of laws which were made for another purpose, and he is in no position to claim the advantage of a formal contract obtained in that way, on the ground that the rights of the parties are to be determined by their language and their overt acts, without reference to the influences which moved them. In such a case there is no reason why one should

be bound by a contract obtained by force, which in reality is not his, but another's."

Ins. Co. v. Kirkpatrick, 111 Ala. 456, 20 South. 651, is another frequently cited case. We quote from the opinion in that case:

"It was never contemplated in the law that either the actual or threatened use or misuse of criminal process, legal or illegal, should be resorted to for the purpose of compelling the payment of a mere debt, although it may be justly owing and due, or to coerce the making of contracts or agreements from which advantage is to be derived by the party employing such threats. Ample civil remedies are afforded in the law to enforce the payment of debts and the performance of contracts, but the criminal law and the machinery for its enforcement have a wholly different purpose, and cannot be employed to interfere with that wise and just policy of the law that all contracts and agreements shall be founded upon the exercise of the free will of the parties, which is the real essence of all contracts.

"In the later and better considered cases, both English and American, the distinction above referred to is not recognized, but, as we think, is justly discarded. We approve the statement of the doctrine as declared in Morse v. Woodworth, 155 Mass. 251."

We can at this point appropriately call attention to article 1187, P. C. of Texas, which makes it a penal offense "if any person, with intent to extort money, or any pecuniary advantage, shall threaten to accuse another of a felony," a statute clearly predicated upon a recognition of the view expressed in the above quotations.

The contrary doctrine is held in some of the states, notably in Maine. In the case of Hilborn v. Bucknam, 78 Me. 482, 7 Atl. 272, 57 Am. Rep. 816, in which the facts were strikingly similar to those in Landa v. Obert, 45 Tex. 547, Obert v. Landa, 59 Tex. 475, and Landa v. Obert, 78 Tex. 33, 14 S. W. 297, the court gives the following quotation:

"It is not duress for one who believes that he has been wronged to threaten the wrongdoer with a civil suit. And if the wrong includes a violation of the criminal law, it is not duress to threaten him with a criminal prosecution. * * * It is not in human nature to exercise such restraint. It is unreasonable to expect it, and the law does not require it. The law regards it as the duty of every one who knows of the commission of a crime to take measures to have the offender brought to justice; and it does not involve itself in the absurdity of making it unlawful for one to express to the offender an intention of doing what the law makes it his duty to do."

A statement of the two doctrines is given in 10 Am. & Eng. Enc. of Law (2d Ed.) pp. 342, 343, and 9 Ruling Case Law, 719, where the authorities are collated.

The case of Landa v. Obert is often cited as committing the Supreme Court of Texas to the doctrine announced in the Maine decisions.

Since we have no doubt of the correctness of the conclusion reached in the Landa Case, we do not deem it necessary to discuss the question whether such interpretation of the Landa Case is or is not correct.

It should be borne in mind that, in so far as that was an action based upon duress, the right of recovery was predicated upon the alleged falsity of the charges made by Landa. The case has another distinguishing element in that there was a contract made under which Obert was entitled to a readjustment in case it should be later determined that Landa was not entitled to what he had received under the settlement. These elements may distinguish the Landa Case from those adhering to the Maine doctrine.

However that may be, there are several exceptions to the rule, which are recognized even in jurisdictions in which the Maine doctrine is followed. These are that duress may be predicated upon a threat of lawful imprisonment:

(1) Where the purpose of the threat is to exact a consideration wholly disconnected from the offense for which prosecution is threatened. 9 R. C. L. 719. To this effect is Thompson v. Hicks (Civ. App.) 100 S. W. 357. It is proper to state in this connection that it will of course be understood that the other elements of duress must be present when such threat is made.

(2) Where the purpose and effect of the threat is to exact an unconscionable bargain. This view is discussed in Wilbur v. Blanchard, 22 Idaho, 517, 126 Pac. 1069.

(3) Where the purpose and effect of the threat is to obtain a payment or other pecuniary advantage from a near relative of the party threatened. 9 R. C. L. 727. This doctrine has been uniformly followed whenever the question has been presented to our Courts of Civil Appeals. Gray v. Freeman, 37 Tex. Civ. App. 556, 84 S. W. 1106; Medearis v. Granberry, 38 Tex. Civ. App. 187, 84 S. W. 1070; Shriver v. McCann (Civ. App.) 155 S. W. 320; Burnett v. Bank, etc. (Civ. App.) 191 S. W. 172.

"In such cases the fact that the threatened prosecution or imprisonment may be lawful does not affect the voidability of the contract, nor is actual guilt or innocence of the accused material." 13 C. J. 404.

It is said in some cases that the relief sought in the character of cases last cited falls more properly under the head of undue influence, but the distinction seems to us immaterial.

[1] We are clear, however, that the facts in this case do not bring it within any of the rules announced as constituting duress, but that the case does fall clearly within the scope of the second contention of the plaintiff in error, viz. that the threat, if the evidence warrants the finding of a threat, was nothing more than to resort, not to the pro-

cesses of the criminal law, but to a legal right available to the brewing company in the particular matter to indemnify it for any loss occasioned by the embezzlement on the part of plaintiff's husband. To threaten one with civil proceeding which the law gives to a party for enforcement of his rights clearly is no more than the exercise of a lawful right and could not be the foundation of a legal action. This is true although the inevitable result of carrying out the threat may be to put in motion the processes of the criminal law, and such is the rule in those jurisdictions where imprisonment is given as a civil remedy for the enforcement of a debt; for in those cases the threat of imprisonment is merely the threat to use a remedy given to the threatening party in the particular matter. This remedy still exists in some of the American states in certain characters of torts.

By applying these principles to the facts of the case at bar, it follows necessarily in our judgment that no duress is shown, since the record fully supports the following summary of the evidence, which in large part, indeed practically as a whole, is undisputed, much of it being in written form:

(1) P. E. Harlan had been for many years in the employ of defendant.

(2) He was under bond given by a fidelity company.

(3) He was confessedly short in his accounts in excess of $2,500.

(4) Discussion of his shortage for several months had been without practical results, and early in September, 1914, R. L. Autrey, vice president and manager of the defendant company, went to Beaumont from Houston and told Harlan that the shortage must be settled at once.

(5) Harlan said the only thing he had to offer was his homestead, and Autrey asked him if his wife would sign the deed, and Harlan said he thought she would.

(6) Autrey and Harlan drove out and looked at the property from the outside, but Autrey did not see or speak to the plaintiff, and returned to Houston without knowing whether she would sign the deed or not.

(7) Autrey did not mention the matter of the bond to Harlan, or say anything about probable or possible prosecution. Harlan himself proposed conveyance of the property to "wipe out" the shortage.

(8) Plaintiff saw her husband and Autrey looking at the property, and when her husband came home in the evening she asked the reason for the inspection, and her husband told her he was short in his accounts, and the property would have to be conveyed to the company or the matter would be turned over to the bonding company and he would be prosecuted. They discussed the matter "thoroughly," and plaintiff was much distressed, but said she would sign the deed that evening upon one condition, viz. that he

was in fact short in his account. He assured her he was, as he knew, independent of the audit of the company.

(9) Harlan did not tell his wife that Autrey had said the matter would be turned over to the bonding company if settlement was not made, for Autrey had not said so, but spoke as on his own authority, and he testified that he and his wife both knew that if the matter was turned over to the bonding company prosecution would follow.

(10) On September 12, 1914, which was two or three days after Autrey had been to Beaumont, the Harlans executed the deed.

(11) When her husband went to Houston to deliver the deed, she went with him to find out "whether for sure he was really short in his account." She was shown the statement proving that he was, and the deed was delivered.

(12) She testified, and the jury found, that before actual delivery of the deed she told Autrey what her husband had told her about the bonding company and probable prosecution, but there was no evidence that in reply Autrey made any threat of any kind.

(13) On September 16, 1914, Autrey wrote P. E. Harlan to arrange to give immediate possession, and on September 21, 1914, wrote asking what arrangements had been made to give possession, and added: "You understand that this transaction is not completely closed until possession has been given us."

(14) Later the brewing company was advised that acknowledgment of tenancy would be equivalent to possession.

(15) In October plaintiff went over to Beaumont and rented the property from defendant by the month at $20 per month, and later paid two months' current rent, and in remitting for one month reported a possible opportunity for the company to sell the property.

(16) The property was taken at $3,350, and after deducting from that sum the amount of the vendor's lien notes against the property the balance, $2,578.65, was credited on the shortage, leaving still due defendant $96.42.

(17) On December 3, 1914, Autrey wrote that on that day the brewing company was paying the vendor's lien notes, and sent the Harlans a letter accompanied by a carbon, embodying a statement of the settlement, and confirming the rental contract and showing the balance due. Harlan and wife acknowledged the carbon copy in statutory form, and it was returned to the brewing company.

(18) On February 19, 1915, Autrey wrote plaintiff in response to a letter from her under date of February 10, 1915, in which, among other things, he said, in substance, that when he agreed to take the deed to the property, it was done to save him (P. E. Harlan) from disgrace because of his misappropriation of funds, and that when they did so they were very willing that he should sell the property elsewhere and turn over the

funds, and only agreed to take the property when he (Harlan) stated that he "had exhausted his efforts to sell it." This letter was introduced in evidence by plaintiff, who testified that, "when she acknowledged the letter of December 3, 1914, she was still afraid her husband would be prosecuted.".

[2] From the foregoing full and fair summary of the evidence it is manifest that, if we give full force to all of the testimony favorable to plaintiff, and indulge every favorable presumption which the evidence will justify, it cannot be said that Autrey, either directly or indirectly, threatened to make use of any criminal process himself or to be in any way instrumental in causing it to be used in regard to plaintiff's husband.

The facts clearly show that the husband was short in his accounts with the brewing company to the extent of over $2,500, and was guilty of misapplying the funds of the company to that extent. This he admitted himself, and there is no attempt· in the evidence to dispute that fact. The loss thus occasioned to the brewing company was amply secured by a fidelity bond.

Harlan had no means of making up the shortage, and was given several months in which to do so, but failed. The inevitable consequence of his continued failure to settle was for the brewing company to call upon the surety company to make good the loss. That was a right given by law to the brewing company; and, construing the evidence as warranting the conclusion that a threat, either express or implied, was made to resort to that security, certainly it cannot be said that such threat could in any sense constitute duress.

That the wife was moved solely by a desire to save her husband from disgrace, prosecution, and possible imprisonment cannot be denied. In fact, this is frankly admitted by the brewing company. But that she did so deliberately and of her own free will, and without any compulsion, coercion, or improper influence on the part of the brewing company, is equally conclusively established.

The Court of Civil Appeals in its opinion on rehearing uses this language:

The circumstances "would seem to ponderate against the finding of the jury as to duress," and the "testimony shows that she was exercising discretion, and that there was only one circumstance under which she would sign the deed, and that was if her husband was short in his accounts; clearly this would show that she was not coerced or duressed."

To this state of facts the language of Mr. Black in his work on Cancellation and Rescission is peculiarly applicable.

"One may yield to the pressure of circumstances, or take some course which is repugnant to him, in order to extricate himself from a predicament; but this does not constitute duress if no constraint is exerted by the person benefitting by the action." Black on Resc. & Can. vol. 1, p. 585.

Not only is it true that the plaintiff was not coerced, but the evidence also negatives any purpose or intention on the part of the brewing company to gain any advantage whatever by the transaction. There is no testimony that would warrant a finding that the brewing company obtained more than a fair amount of property for its debt.

After it paid off vendor's lien notes on the property to nearly a fourth of the agreed price, and credited the balance on the shortage, Harlan was still its debtor in the sum of nearly $100, as he acknowledged a statutory form, as did his wife, and both acknowledged tenancy at the same time and in the same way.

The evidence clearly shows that the brewing company preferred having its debt paid to taking the property, and that it accepted the deed from the same motive that actuated the plaintiff; that is, to save Harlan from disgrace, prosecution, and possible imprisonment. All parties seem to have assumed that, if demand were made by the brewing company upon the surety, the latter would prosecute Harlan. There is no suggestion in the testimony that this assumption was not well founded.

Such action, however, on the part of the surety was a matter over which the brewing company had no control, and it certainly could not be expected that the brewing company forego its claim for reimbursement against the surety merely because the latter would prosecute Harlan. Such an act would indeed have been one of philanthropy, but with that altruistic sentiment it is not our province to deal.

No undue haste appears to have been insisted upon by the brewing company in the execution of the deed, no persuasion was exercised by the agent of the brewing company, and the evidence clearly shows that the plaintiff not only had ample time for deliberation, but did carefully deliberate and weigh all of the consequences, and at no time before she executed the deed did Autrey speak to her, write to her, or send her a message.

Before she finally executed the deed, and as a matter of additional precaution, even after signing the deed and before it was delivered, she accompanied her husband to Houston to ascertain if indeed it were true that he was short in his accounts, and was present with him at the time of its delivery. The evidence negatives any unlawful act on the part of the brewing company either in threatening directly or indirectly to prosecute, or to make any unlawful use of the processes of the law to induce plaintiff to execute the deed. The evidence is therefore wholly insufficient to establish the defense of duress.

The finding of the Court of Civil Appeals that there was not sufficient evidence to sustain the finding of the jury that the instrument was a mortgage was clearly correct, as was the holding of the majority on rehearing that the argument of plaintiff's counsel demanded a reversal.

In view of our holding on the question of duress, we have not discussed the question of ratification, since it is purely abstract and academic.

We recommend that the judgment of the district court and that of the Court of Civil Appeals be reversed, and that judgment be rendered for plaintiff in error.

PHILLIPS, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.

---

⊂⊃For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes