**PFEUFFER et al. v. HAAS et al.**
No. 7724.

Court of Civil Appeals of Texas. Austin.
Nov. 23, 1932.

Rehearing Denied Dec. 14, 1932.

Frank B. Voigt, of New Braunfels, and Neil E. Beaton, of San Antonio, for appellants.

Henne & Fuchs, of New Braunfels, for appellees.

## McCLENDON, C. J.

Ernest Haas and Emma Haas (husband and wife) sued Thekla Pfeuffer, individually and as surviving partner of George Pfeuffer Lumber Company, Fred Pfeuffer as independent executor of the estate of U. S. Pfeuffer, deceased, and Tug S. Pfeuffer, to cancel (1) a deed to real estate, the separate property of Emma Haas and the family homestead; and (2) a note and contract executed by Ernest Haas, on the ground of duress predicated upon threats of criminal prosecution of Ernest Haas on the charge of embezzling funds of the lumber company while in its employ as bookkeeper and assistant manager.

Defendants counterclaimed (1) seeking removal of cloud from their title to the real estate; and asserting (2) an equitable lien upon the property to the extent of $3,815.06, the amount of the misappropriated funds alleged to have been applied by Haas in discharge of a trust deed lien upon the property, and $1,113.40 paid out by defendants subsequently to the execution of the Haas deed upon the trust deed lien and taxes; and (3) a claim of $1,140, rental of the premises since execution of the Haas deed. From a judgment in favor of plaintiffs granting the relief prayed for and awarding defendants recovery upon their counterclaim for the amounts paid by them subsequently to the execution of the Haas deed, defendants have appealed, and plaintiffs have cross-assigned error upon defendants' recovery upon their counterclaim.

The record will support both as a matter of law and factually the following controlling facts which are stated only in broad outline:

George Pfeuffer Lumber Company was a copartnership composed of U. S. and S. V. Pfeuffer, who were brothers. S. V. Pfeuffer died in August, 1928, and Thekla Pfeuffer, his widow and independent executrix, continued as a member of the firm, and the business was conducted in the same way as prior to the death of her husband, until the death of U. S. Pfeuffer, in December, 1929. Ernest Haas was employed by the firm as bookkeeper, with general duties of assistant manager, from about 1917 until March, 1930. U. S. Pfeuffer occupied the position of managing partner at least to the extent of dealings between the firm and its employees. Whatever participation S. V. Pfeuffer exercised in the firm's business appears to have been through conferences with U. S. Pfeuffer. The testimony shows a rather unusual method of dealings between the firm and Haas and another employee, Mergele, in that the personal bills and accounts of these employees were paid by the firm and charged to them on the firm's books as bills receivable. For at least several years prior to December, 1929, the salaries of these two employees were not paid by check, but were merely entered as credits on their accounts. Both Haas and Mergele had authority to draw checks upon the firm account. In a number of instances checks in payment of accounts or indebtedness of Haas and Mergele were signed by U. S. Pfeuffer, who the evidence showed had knowledge of and consented to this course of business. After the death of C. V. Pfeuffer, Mrs. Thekla Pfeuffer took no active part in the business of the firm, but appears to have been represented by her son, Fred Pfeuffer. U. S. Pfeuffer continued as managing partner to the same extent as before, consulting at times with Fred Pfeuffer, who claims not to have had any knowledge of the indebtedness of Haas and Mergele until shortly after the death of U. S. Pfeuffer (whose independent

executor he became). Thereupon he employed one Gilligan, an accountant of San Antonio, to audit the books of the firm, and upon the completion of this audit in March, 1930, the indebtedness of Haas was adjusted in the following manner: Haas executed an agreement acknowledging that he had overdrawn his account in the sum of $17,568.52; and agreed that he and his wife would convey the homestead property for a consideration of $7,000, to be applied as a credit upon his indebtedness; and that he would execute a note to be joined in by his wife for $10,568.52, payable on or before ten years from date without interest, to secure which he would deposit four insurance policies upon his life for the aggregate amount of $13,000. This agreement was dated March 13, 1930. On the same day he and his wife executed the deed to the homestead property.

Since we are reversing the trial court's judgment on account of improper argument of plaintiffs' counsel, we refrain from a detailed statement of or comment upon the evidence upon the issue of duress, which is amply supported as to both spouses, both as a matter of law and factually.

The court submitted five special issues of its own, and three, Nos. D4, D5, and D6, requested by defendants. These and the jury's answers thereto follow:

"1. Do you believe from the preponderance of evidence that the funds of George Pfeuffer Lumber Company which the account of E. H. Haas on the books of said company shows were applied to payment of the costs of improvement of the Haas' property, were so applied with the knowledge and consent of U. S. Pfeuffer, the then managing partner of said Lumber Company?" Answer: "Yes."

"2. Do you believe from the preponderance of evidence that it was understood and agreed between E. H. Haas and U. S. Pfeuffer, acting for the Lumber Company, that the sums of money represented by the Account of E. H. Haas on the books of the Lumber Company would eventually be charged off the books of said Company?" Answer: "Yes."

"3. Do you believe from the preponderance of evidence that the execution by E. H. Haas of the contract and deed of date March 13th, 1930, was induced and procured by threats of criminal prosecution for embezzlement?" Answer: "Yes."

"4. Do you believe from the preponderance of evidence that the execution by Mrs. Emma Haas of the deed of March 13th, 1930, was induced and procured by threats of criminal prosecution for embezzlement against her husband?" Answer: "Yes."

"5. Do you believe from the preponderance of evidence that the execution by Mrs. Emma Haas of the deed of March 13th, 1930, was induced and procured by representations upon the part of Fred Pfeuffer, acting for said Lumber Company, that said deed would not act as a deed of conveyance to her interest in the property described therein?" Answer: "Yes."

"D4. Do you believe from the preponderance of the evidence that the contract made by E. H. Haas, dated March 13th, 1930, and the deed dated the same day, were made in consideration of the agreement of Fred Pfeuffer not to prosecute E. H. Haas upon a charge of embezzlement from George Pfeuffer Lumber Company?" Answer: "Yes."

"D5. Do you believe from the preponderance of the evidence that at the time of actually signing the deed, E. H. Haas was in such fear of criminal prosecution for embezzlement that he was completely deprived of the free exercise of his will power?" Answer: "Yes."

"D6. Do you believe from the preponderance of the evidence that at the time of actually signing the deed, Emma Haas was in such fear of her husband, E. H. Haas, being criminally prosecuted for embezzlement that she was completely deprived of her will power?" Answer: "Yes."

By their first proposition appellants contend that they were entitled to judgment as a matter of law, because the evidence conclusively showed that Haas had embezzled partnership funds and applied them to the discharge of the trust deed lien upon the homestead property. It is contended in this connection that Mrs. Haas, whether or not she knew of such embezzlement and application, could not assert a homestead right in the property as against the claim of defendants.

As we have stated above, the evidence was sufficient to support the finding of the jury that U. S. Pfeuffer was cognizant of and consented to the overdrafts. This fact would, in our judgment, negative any criminal offense on Haas' part. Absent an express statute making it so, a partner cannot be guilty of embezzling partnership funds. See Culp v. Robey (Tex. Civ. App.) 294 S. W. 647; reversed (Tex. Com. App.) 299 S. W. 846, but upon other grounds.

This holding is predicated upon the partner's ownership of an undivided interest in all partnership property. And since a third party could not be guilty of embezzling the interest of a consenting partner, by parity of reasoning such consent would extend to the entire ownership of the property.

However, a partner does occupy such fiduciary relationship to partnership funds as to raise a constructive trust in favor of the other partners in any property into which they may trace partnership funds which he has misappropriated. Smith v. Green (Tex. Civ. App.) 243 S. W. 1006 (error refused); First State Bank v. Zelesky (Tex. Civ. App.) 262 S. W. 190.

This right of reimbursement is predicated upon a wrongful act which gives rise to a constructive trust. The same rule would apply to an employee who fraudulently appropriates partnership funds, even though with the consent of one of the partners.

To amount to a fraudulent misappropriation on the part of an employee, he must either have known of the want of authority in the consenting partner, or must have been charged in law with knowledge thereof.

It is not contended by appellants that there was any collusion between U. S. Pfeuffer and Haas; nor that there was any fraudulent or wrongful act on the former's part in giving his consent to the overdrafts. Their contention is that even conceding the knowledge and consent of U. S. Pfeuffer, he did not have the apparent authority to bind the other partners therein so as to relieve the action of Haas of its fraudulent or wrongful character. In this we do not concur. Whether or not the evidence warranted the conclusion that U. S. Pfeuffer occupied the position of managing partner generally, it amply warranted the conclusion that he occupied such position as regards Haas and Mergele. As above stated, the course of business under which the large overdrafts were allowed to accumulate was very unusual; it had, however, extended over quite a period of years; and there was no element of concealment on the part of Haas. His entire course of conduct in the matter was open and above board, and each transaction was carried in detail upon the books of the company, of which U. S. Pfeuffer must have had knowledge. This latter conclusion would be a reasonable one independently of the affirmative testimony of such knowledge and his express consent thereto. It was at least a jury question whether under the circumstances Haas was warranted in assuming that U. S. Pfeuffer had authority to do what the evidence showed that he did. If he had such authority, either actual or apparent, the overdrafts would not constitute fraudulent misappropriation or other wrongful act which is essential to the raising of a constructive trust. The overdrafts in such event would merely constitute a simple debt owing by Haas to the partnership.

In the absence of authority, actual or apparent, in U. S. Pfeuffer to bind the partnership, the nonconsenting partners would be subrogated to the rights of the trust deed lienholder to the extent of their interest in the partnership funds which were wrongfully used in discharging that debt.

The submission of the second special issue was objected to for a number of reasons. We need only consider one of these, which we sustain, namely, that the promise (alleged and supported by evidence) of U. S. Pfeuffer to charge off or take care of the overdraft of Haas was unsupported by any consideration, and merely amounted to a promise to make a gift at some future time. Such promise was unenforceable even against the promisor, and it was immaterial whether he had authority to bind the partnership therein.

It is urged that special issues 3 and 4 are defective in that they do not include Haas' innocence of the crime of embezzlement as a necessary element to actionable duress.

In so far as Haas is concerned, there are two lines of authority upon this subject. One line, referred to in Ruling Case Law (volume 9, pp. 119, 120) as being "supported it is believed by the better reasoning," and by Chief Justice Fly (Sabinal State Bank v. Ebell [Tex. Civ. App.] 294 S. W. 226, 227) as the "modern doctrine," is to the effect that to constitute duress "the threatened prosecution need not be for a crime or offense of which the party threatened is not guilty." For a full discussion of the two doctrines, the respective reasons upon which they are supported, and authorities thereon, see Houston Ice & Brewing Co. v. Harlan (Tex. Com. App.) 228 S. W. 1090, 1091; 10 Texas Jurisprudence, pp. 81–83, § 47; and notes in 26 L. R. A. page 48, 20 L. R. A. (N. S.) page 484, and 17 A. L. R. 325, et seq. We adhere to the rule announced by Chief Justice Fly, and overrule this contention of appellants.

As regards Mrs. Haas, the situation presented is brought within the following well-recognized exception to the doctrine contrary to that above adhered to:

"Where the purpose and effect of the threat is to obtain a payment or other pecuniary advantage from a near relative of the party threatened. 9 R. C. L. 727. This doctrine has been uniformly followed whenever the question has been presented to our Courts of Civil Appeals. Gray v. Freeman, 37 Tex. Civ. App. 556, 84 S. W. 1105, 1106; Medearis v. Granberry, 38 Tex. Civ. App. 187, 84 S. W. 1070; Shriver v. McCann (Tex. Civ. App.) 155 S. W. 317, 320; Burnett v. Bank, etc. (Tex. Civ. App.) 191 S. W. 172.

" 'In such cases the fact that the threatened prosecution or imprisonment may be lawful does not affect the voidability of the contract, nor is actual guilt or innocence of the accused material.' 13 C. J. 404.

"It is said in some cases that the relief sought in the character of cases last cited falls more properly under the head of undue influence, but the distinction seems to us immaterial." Houston Ice & Brewing Co. v. Harlan, supra.

See, also, Robertson v. Shinn Grocery Co. (Tex. Civ. App.) 34 S.W.(2d) 367 (error ref.).

Appellants further contend that appellees are barred from affirmative relief on

the ground that the evidence supporting duress also shows that the transaction was tainted with illegality, in that it embodied an agreement to compound a crime. In Prim v. Farmers' Nat. Bank (Tex. Com. App.) 44 S.W.(2d) 943, it was held that a threat to prosecute, unless an indebtedness owed by the threatened party was "fixed up," necessarily implied an offer not to prosecute, which if accepted would constitute an illegal agreement, so far as concerns the party making the threat. There is some authority for the proposition that duress may not be urged where there is an agreement not to prosecute. But by far the weight of authority and to our mind the better reasoning are to the contrary. This latter view is sometimes rested upon the proposition that the parties are not in pari delicto. But independently of this view, we think illegality of the consideration of the contract in so far as concerns the threatened party is rendered immaterial by the fact that duress connotes overpowering the free will, and therefore excludes a necessary element of a valid contract (meeting of the minds of the parties). Estoppel predicated upon the illegality of a contract should not be available against one whose assent thereto has been procured by duress and is therefore in law no assent.

█ Some time after the jury had retired, they propounded to the judge the following question in writing: "Would like to get a little information regarding Request issue No. 5 beginning at the word completely deprived of the free exercise of his will power." To which the judge replied, also in writing: "By the terms 'that he was completely deprived of the free exercise of his will power' is meant: To constitute duress the influence exerted must be of such a character as to destroy the free agency of the party influenced, and must overcome his will and cause him to do that which he would not otherwise do."

It does not appear that this reply was submitted to counsel before delivery to the jury. It was assigned as error in appellants' motion for new trial upon objection therein alleged to have been "duly and timely made," upon the ground in substance that it did not truly answer the jury's inquiry in that it substituted "the signing of said deed as a matter of expediency" for "the entire element of deprivation of free will." We do not think the language employed can be fairly given this interpretation. It is a literal copy of the definition given in 10 Tex. Jur. p. 41, which is an accurate deduction from the authorities there cited. It might be better to omit from the court's definition the words "to constitute duress," and substitute therefor, "that," and to insert "thereby" between "and" and "cause him." Whether the record shows that the objection was seasonably urged, and if so whether the ground of

objection was sufficiently clear to raise this issue, we find it unnecessary to decide. Since this was a part of the court's charge to the jury, proper practice required that it be submitted to counsel for their objections before delivery to the jury. Objections not so made may not be urged on appeal.

█ Counsel for plaintiffs, in his closing argument to the jury, used the following language, not objected to at the time, but assigned as error in the motion for new trial and in this court:

"Haas possibly was not as careful as he should have been, but he is entitled to have his home free from debt. I have appeared in many cases during my twenty-four years of practice, but I never appeared in any case where I have been more interested than in the case of these two people defending their home. He is in hard circumstances and it will be hard for him to find work this winter. You can throw him out if you want to, but our forefathers wrote in the Constitution of this State the homestead law. If a man lives in the country he is entitled to 200 acres free of debt; if he lives in the city he is entitled to a home free of debt. They recognized that the homeowners make the nation. They are entitled to a home where they can go free and undisturbed by the law —a haven of rest where they can live and die.

"The Court: Gentlemen of the Jury, you are to consider only such arguments as bears upon the testimony from the witness stand.

"You can turn them out in the streets if you want to, but I am not going to be a party to it; I am not going to be responsible for it.

"You can take their home from them, but I am not going to assume the responsibility. They sold these notes to somebody else, they got their money.

"You can take their home from them. That is what it would mean to them. One of the greatest men that the United States ever produced made the statement: 'It is not necessary to be rich in order to be happy; the laughter of a child will brighten.' Will there be any laughter in and about this home if you take it away from them? Their laughter will be turned into tears and cries of the children.

"In answering these questions, you might at least go to your homes or the homes of your parents—maybe some of you now live in the homes where you were born—and there by the fireside of that old home, write your verdict in harmony with that old song, 'Home, Sweet Home, be it ever so humble, there is no place like home,' and we will be satisfied."

This argument was manifestly improper

as placing upon the jury the responsibility of depriving plaintiffs of their home, and appealing to them to give their answers to the issues accordingly, regardless of what they might believe to be the true answers to the issues, based upon the evidence. This character of argument has been repeatedly condemned by our appellate courts. In a recent case, virtually on all fours with the case at bar, as regards this particular question we said: "There have been a number of recent decisions by the Commission of Appeals upon the subject of improper argument of counsel. From these the general rule may be deduced that, where the case is one in which the situation of one of the parties is such as to appeal to the sympathy of men of normal emotions, and the argument is such as to excite such sympathy to action, the judgment will be reversed, even though the jury may be instructed to disregard the argument, unless it can be said, from an examination of the entire record, that all reasonable doubt as to the deleterious effect of the argument has been removed." Barnes v. McCulloch (Tex. Civ. App.) 53 S.W.(2d) 89, 90. The quoted argument clearly, we think, falls with this rule.

The recent case of Lane v. Cunningham (Tex. Civ. App.) 38 S.W.(2d) 906, 909 (now pending in the Supreme Court on writ of error granted), is cited as holding that argument of this character is not "so vicious and prejudicial in its nature as that the effect thereof, if any, upon the jury, was not removed by the court's instruction" not to consider it. It is to be observed that the main holding upon which the court rested its decision was that "the bill of exceptions * * * does not disclose, either that there was no evidence to justify the argument, or that there was no argument on the part of the opposing counsel to provoke it."

Whatever may have been the situation in Lane v. Cunningham, we cannot conceive of any character of evidence which would justify the argument in the instant case, nor can we visualize any argument of opposing counsel to which it would constitute a legitimate reply. Bills of exceptions are required to be presented to opposing counsel before they are approved by the judge. If upon their face they present prejudicial error, ample means are afforded to embody in the record such matters as may remove or mollify its deleterious effects. The record on appeal is supposed to embody everything material to the questions presented for review. The right to such review should not be defeated or impaired by the mere surmise or possibility that something as to which the record is silent might have occurred which would render the adverse ruling innocuous.

The quoted argument falls, we think, within that class as to which instruction not to consider is held not reasonably calculated to remove the harm already done. It is to be noted that after the court directed the jury "to consider only such arguments as bear upon the testimony from the witness stand," the same argument was reiterated a number of times, which was not the case in Lane v. Cunningham.

The points urged in the cross-assignments need not arise upon another trial, hence their consideration is unimportant.

The trial court's judgment is reversed, and the cause remanded for a new trial.

Reversed and remanded.

### On Appellees' Motion for Rehearing.

The motion assigns error in reversing the judgment on account of improper argument of counsel urging that "there was sufficient evidence to justify it, or at least to render it harmless." Humphreys v. Roberson (Tex. Civ. App.) 52 S.W.(2d) 932, is cited and quoted from at length in support of the assignment. The general principles announced in that case are of unquestioned soundness; but they are clearly not applicable here.

The further point is made that admissions of appellants rendered them "guilty of duress as a matter of law," and therefore a directed verdict would have been proper. It may be that the evidence as a matter of law establishes the threats; in any event, the evidence upon this point was very strong. But threats alone do not constitute duress. To do so they must overcome the free will of the party threatened. Upon this fact issue there was a sharp conflict in the evidence; and without invading the province of the jury, we could not reach a reasonable conclusion as to where the preponderance of evidence lay.

It is true, as pointed out in the motion, that the writ of error was not granted in Lane v. Cunningham upon the argument of counsel. That point was not urged in the application. We do not question the correctness of the conclusion in that case that the argument probably had no deleterious effect, under all the circumstances there presented. As pointed out in our original opinion, we have an entirely different situation here, as to which the holding there is not in point.

We did, however, disagree with the holding in that case to the effect that the bill of exceptions must disclose "either that there was no evidence to justify the argument, or that there was no argument on the part of the opposing counsel to provoke it." In this we are supported by the opinion (published after our decision was announced) in West Texas Utilities Co. v. Renner, 53 S.W.(2d) 451, 455, in which Judge Ryan, writing for Section B of the Commission of Appeals, says: "In Texas Indemnity [Ins.] Co. v. McCurry (Tex. Com. App.) 41 S.W.(2d) 215,

217, 78 A. L. R. 760, it was held that a bill of exceptions to improper argument is not required to negative any possible fact or state of attending circumstances that would render the objectionable matter without prejudicial effect. It was there stated: 'The rule is now settled in this state that, where improper argument has been indulged in, the adverse complaining party is entitled to reversal of the judgment, as a matter of law, if under all the circumstances there is any reasonable doubt of its harmful effect, or unless it affirmatively appears no prejudice resulted. [Citing numerous authorities.]"

The motion is overruled.

Overruled.